880 A.2d 468 (2005)
380 N.J. Super. 1
STATE of New Jersey, Plaintiff-Appellant,
v.
Porfirio JIMENEZ, Defendant-Respondent.
State of New Jersey, Plaintiff-Respondent,
v.
Porfirio Jimenez, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 2005.
Decided August 17, 2005.
*470 John McNamara, Jr., Assistant Prosecutor, argued the cause for appellant State of New Jersey in A-3736-04T2 and respondent in A-3737-04T2 (Michael M. Rubbinaccio, Morris County Prosecutor, attorney; Mr. McNamara, Jr., Ralph Amirata and Brian Kenney on the brief).
Joseph Krakora, Assistant Public Defender, argued the cause for appellant Porfirio Jimenez in A-3737-04T2 and respondent in A-3736-04T2 (Yvonne Smith Segars, Public Defender, attorney; Mr. Krakora and Susan Remis Silver, Special Assistant to the Public Defender, of counsel and on the brief).
Before Judges FALL, PAYNE and C.S. FISHER.
The opinion of the court was delivered by
PAYNE, J.A.D.
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) the United States Supreme Court held that the execution of mentally retarded defendants convicted of capital murder constituted excessive punishment that violated the Eighth Amendment to the United States Constitution. However, it left to the states the task of developing the procedures to be utilized in determining who should thus be exempted. Although most states have established these procedures by statute or judicial decision, New Jersey has not.[1] Therefore, the issue was novel in this State when it was raised by motion on behalf of defendant Porfirio Jimenez *471 prior to his trial for capital murder.[2] In these interlocutory appeals, which we hear back-to-back by leave granted, both the State and Jimenez challenge the procedures established in the trial court for determining the applicability of Atkins to a capital defendant prior to trial and after the guilt phase. We affirm the latter, but reverse the former.

I.

A. The Atkins Decision

In Atkins, a six-member majority of the Supreme Court, abrogating the Court's prior decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) in light of evolving standards of decency as reflected in legislative enactments[3] and other sources, found the execution of mentally retarded defendants convicted of capital murder to be excessive punishment, because that punishment was not proportional to the defendant's personal responsibility and moral guilt, and thus was violative of the Eighth Amendment's prohibition of cruel and unusual punishments. The Court observed: "mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial." 536 U.S. at 318, 122 S.Ct. at 2250, 153 L.Ed.2d at 348. However, it recognized that because of their impairments, by definition the mentally retarded
have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.
[Id. at 318, 122 S.Ct. at 2250-51, 153 L.Ed.2d at 348 (footnotes omitted).]
As the result of these intellectual deficiencies, the Court found two bases for the categorical exclusion of the mentally retarded from capital punishment. First, the Court found that a serious question existed as to whether either deterrence or retribution, the commonly recognized justifications for capital punishment, applied to the mentally retarded. Id. at 318-19, 122 S.Ct. at 2251, 153 L.Ed.2d at 349. Retribution, the Court found, was a concept that required proportionality between the severity of the punishment and the culpability of the offender  a culpability that was recognized to be lessened in the retarded. "If the culpability of the average murderer is insufficient to justify the most *472 extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." Id. at 319, 122 S.Ct. at 2251, 153 L.Ed.2d at 349. The Court similarly found that deterrence did not present a compelling rationale for the imposition of the death penalty upon the mentally retarded because "the same cognitive and behavioral impairments that make these defendants less morally culpable  for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses  . . . also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information."[4]Id. at 320, 122 S.Ct. at 2251, 153 L.Ed.2d at 349.
Additionally, the Supreme Court observed that "some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards." Id. at 317, 122 S.Ct. at 2250, 153 L.Ed.2d at 348. As a consequence, a risk exists that the death penalty will be imposed despite factors that may call for a lesser penalty. Id. at 320, 122 S.Ct. at 2251, 153 L.Ed.2d at 350 (quoting Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978)). Not only is there a possibility of false confessions, but also mentally retarded defendants may possess a lesser ability "to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. at 320-21, 122 S.Ct. at 2251-52, 153 L.Ed.2d at 350. Further, the Court found, reliance on mental retardation as a mitigating factor, a device frequently employed in capital sentencing, may be counterproductive, since jurors may construe the existence of the condition, instead, as enhancing the likelihood of future dangerousness, a commonly-employed aggravating factor. Id. at 321, 122 S.Ct. at 2252, 153 L.Ed.2d at 350. Mentally retarded defendants in the aggregate face a special risk of wrongful execution. Ibid.
The Court's decision in Atkins forms a part of a trilogy, consisting also of Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding that the Eighth Amendment prohibits states from inflicting the death penalty upon a defendant who is insane) and Roper v. Simmons, ___ U.S. ___, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that execution of a defendant who commits a capital crime while under the age of eighteen is prohibited by the Eighth Amendment). In both Ford and Atkins, the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Ford, supra, 477 U.S. at 416-17, 106 S.Ct. at 2605, 91 L.Ed.2d at 351; Atkins, supra, 536 U.S. at 317, 122 S.Ct. at 2250, 153 L.Ed.2d at 348.
Although the Court's procedural invitation is seemingly broad, we recognize it to be limited not only by the strictures of the United States Constitution, but also those of the Constitution of New Jersey. See id., art. I, ¶ 9.
*473 We are also very mindful of the fact that what we are concerned with here is the implementation of the death penalty, not some lesser, reversible punishment. Atkins has established that even in cases in which capital punishment would otherwise appear warranted, that sanction cannot constitutionally be applied to the retarded. As stated in non-categorical terms in Roper:
The death penalty may not be imposed on certain classes of offenders, such as juveniles under [18], the insane, and the mentally retarded, no matter how heinous the crime. These rules vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders.
[___ U.S. at ___, 125 S.Ct. at 1195, 161 L.Ed.2d at 21 (citations omitted).]
This is so, in the case of retardation, because we as a civilized society can no longer justify the infliction of so irrevocable a penalty upon one whose culpability is lessened by mental infirmity. Lingering concerns regarding the reliability and fairness of capital proceedings involving the mentally retarded reinforce that view. In Ford, the Court observed that in capital proceedings, it "has demanded that fact-finding procedures aspire to a heightened standard of reliability." 477 U.S. at 411, 106 S.Ct. at 2602, 91 L.Ed.2d at 347. And the Court has held if, as here, the Constitution renders the fact of execution contingent upon the establishment of a further fact  the mental status of the defendant  "then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being." Id. at 411, 106 S.Ct. at 2602-03, 91 L.Ed.2d at 347-48. See also State v. Harris, 181 N.J. 391, 525, 859 A.2d 364 (2004) (Harris III) (quoting Ford), cert. denied, ___ U.S. ___, 125 S.Ct. 2973, ___ L.Ed.2d ___ (2005). We thus view a maximal reduction of the risk of wrongful execution to constitute both a moral and a constitutional imperative. That view underlies our opinion in this case.

B. The Capital Trial

In order to place the present issues in context, we briefly summarize the procedures employed in New Jersey in a capital prosecution. As described by the Court in State v. Fortin, 178 N.J. 540, 843 A.2d 974 (2004) (Fortin II):
Under New Jersey's death penalty statute, N.J.S.A. 2C:11-3c, the State must prove specific facts in each step of a three-tiered process before a defendant may be sentenced to death. First, the State must prove beyond a reasonable doubt that the defendant purposefully or knowingly caused death or serious bodily injury resulting in death. N.J.S.A. 2C:11-3a(1), (2). Second, the State must prove beyond a reasonable doubt one of the capital "triggers" in order to advance the defendant to the penalty-phase trial.[5]
[Id. at 634, 843 A.2d 974.]
If the jury is unable to agree that one of the triggers has been proven beyond a reasonable doubt, the defendant is sentenced to a term of imprisonment of at least thirty years without parole eligibility pursuant to N.J.S.A. 2C:11-3b(1) or to life imprisonment with no possibility of parole pursuant to N.J.S.A. 2C:11-3b(2) or (3). If the jury unanimously finds a capital trigger to exist then,

*474 [t]hird, in the penalty-phase trial, the State must prove beyond a reasonable doubt the existence of any alleged statutory aggravating factors. N.J.S.A. 2C:11-3c(2)(a). If the jury finds one or more aggravating factors, it must then determine whether those outweigh all of the mitigating factors beyond a reasonable doubt. N.J.S.A. 2C:11-3c(3)(a).
[Fortin II, supra, 178 N.J. at 635, 843 A.2d 974.]
The defendant has the burden of producing evidence of the existence of any mitigating factors set forth in N.J.S.A. 2C:11-3c(5) "but shall not have a burden with regard to the establishment of a mitigating factor." N.J.S.A. 2C:11-3c(2)(a). Prior to Atkins, mental retardation could be considered solely as a mitigating factor. N.J.S.A. 2C:11-3c(5)(d) or (h).
Pursuant to N.J.S.A. 2C:11-3c(3):
(a) If the jury or the court finds that any aggravating factors exist and that all of the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors, the court shall sentence the defendant to death.
(b) If the jury or the court finds that no aggravating factors exist, or that all of the aggravating factors which exist do not outweigh all of the mitigating factors, the court shall sentence the defendant pursuant to subsection b.
(c) If the jury is unable to reach a unanimous verdict, the court shall sentence the defendant pursuant to subsection b.
Subsection b(3)(a) and (b) specify that a person convicted of murder of a child under the age of fourteen years while in the course of the commission of sexual assault in violation of N.J.S.A. 2C:14-2 or criminal sexual contact in violation of N.J.S.A. 2C:14-3 who is not sentenced to death shall be sentenced to a term of life imprisonment without eligibility for parole.
Thus, in summary, a finding by the jury of purposeful or knowing murder only exposes a defendant to a sentence between thirty years and life imprisonment. "Without any other finding by the jury, life imprisonment is the maximum allowable sentence under the capital-murder statute." N.J.S.A. 2C:11-3b. "The jury must find a capital trigger and an aggravating factor to elevate the punishment from a term of imprisonment to death." Fortin II, supra, 178 N.J. at 636, 843 A.2d 974 (emphasis supplied).

C. Facts of This Matter

On May 22, 2001, the body of W.C., a ten-year-old boy, was found near the Whippany River in Morristown after a two-day search. When discovered, the child's body showed evidence of multiple stab wounds. It is alleged that his head had been bludgeoned with a garden tool, that he had been sexually assaulted, and that evidence of semen was found in his underpants.
Investigation, described in fuller detail by the Supreme Court in State v. Jimenez, 175 N.J. 475, 815 A.2d 976 (2003), led the police to defendant, who gave a lengthy confession to the police following his arrest on May 28, 2001 that contained details of the murder. In September 2001, defendant was charged by a Morris County Grand Jury with murder in violation of N.J.S.A. 2C:11-3a(1) and N.J.S.A. 2C:11-3a(2) (count one), two counts of felony murder in violation of N.J.S.A. 2C:11-3a(3) (counts two and four), kidnapping in violation of N.J.S.A. 2C:13-1b (count three), attempted aggravated sexual assault in violation of N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2a(1) (count five), attempted aggravated sexual assault in violation of N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2a(6) (count six), and third-degree possession of a *475 weapon for an unlawful purpose in violation of N.J.S.A. 2C:39-4d (count seven.) The State notified Jimenez of its intent to seek the death penalty by filing a notice of aggravating factors pursuant to N.J.S.A. 2C:11-3c(2) and R. 3:13-4(a). However, following the Supreme Court's decision in Fortin II, 178 N.J. at 632-650, 843 A.2d 974, finding that aggravating factors are the functional equivalent of elements of capital murder and thus must be submitted to a grand jury and returned in an indictment, Jimenez's case was re-presented to a grand jury together with allegedly applicable aggravating factors.[6] A superseding indictment amending count one to include the aggravating factors found by the grand jury and otherwise containing the same counts was handed down.
Prior to trial, counsel for Jimenez advised the court and the State that they intended to pursue an Atkins claim on Jimenez's behalf and, in that connection, they submitted the September 17, 2004 report of Frank J. Dyer, Ph.D., an expert in forensic psychology. The trial judge then requested that both parties propose procedures to permit an adjudication of the mental retardation issue. On September 23, 2004, the defense filed a motion seeking an order that would preclude the State from seeking the death penalty and would establish specific procedures to assess Jimenez's retardation claim. The State then successfully sought to compel a mental evaluation of Jimenez, which was conducted by forensic psychologist Frank Dattilio, Ph.D.[7] Dr. Dattilio issued reports dated December 24, 2004 and January 25, 2005.
Both the State and the defense have agreed that the appropriate definition for mental retardation is that promulgated by the American Psychiatric Association (APA) and contained in its Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed.2000), which requires evidence of significantly subaverage general intellectual functioning (Criterion A), accompanied by significant limitations in adaptive functioning in at least two enumerated skill areas (Criterion B) and onset before the age of eighteen years (Criterion C). Significantly subaverage intellectual function is defined as an IQ of 70 or below, as measured by one or more of the standardized individually administered intelligence tests. Because a measurement error of five points in assessing IQ is recognized, a score of 70 in actuality may represent a range of 65 to 75. Mild mental retardation is generally *476 associated with IQ levels in the range of 50-55 to 70; moderate retardation with IQ levels of 35-40 to 50-55; severe retardation with IQ levels of 20-25 to 35-40; and profound mental retardation with IQ levels below 20 or 25.
In addition to evidence of IQ levels within the specified range, a diagnosis of mental retardation depends on a determination that the person has significant limitations in adaptive function in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. In the context of a criminal prosecution, the fact that the condition must arise before the person is eighteen years of age provides important protections against specious claims premised on symptoms manifesting at or around the time of that prosecution.
Because a mentally retarded defendant must nonetheless possess the mental competency to stand trial, we assume that the vast majority of defendants to whom Atkins may apply will be found to suffer from mild mental retardation. The DSM-IV describes mild mental retardation in the following terms:
Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.
The defendant in Atkins was alleged to be mildly mentally retarded, with an IQ of 59. Atkins, supra, 536 U.S. at 309, 122 S.Ct. at 2245, 153 L.Ed.2d at 342. His mental age was described by dissenting members of the Supreme Court of Virginia as between nine and 12. Id. at 310, 122 S.Ct. at 2246, 153 L.Ed.2d at 343 (citing Atkins v. Virginia, 260 Va. 375, 534 S.E.2d 312, 323-25 (2000) (dissenting opinion of Justices Hassell and Koontz)).
In the present case, both Dyer and Dattilio agreed, following administration in Spanish of the Wechsler Adult Intelligence Scale-Revised,[8] that Jimenez's IQ fell into the Mildly Retarded range. Dr. Dyer obtained a score of 68, whereas Dr. Dattilio obtained a score of 69. However, the two experts differed as to Jimenez's adaptive functioning. Dr. Dyer found him to be deficient in a number of areas of adaptive behavior, whereas Dr. Dattilio did not.[9]

*477 D. Trial Court Decision

Following briefing and argument, on March 7, 2005, the trial judge issued a written opinion establishing the procedures to be utilized in determining Jimenez's mental status.
He commenced by affirming that the utilization of the DSM-IV definition of mental retardation accorded with the New Jersey Supreme Court's decision in Harris III, supra, 181 N.J. at 528-530, 859 A.2d 364 and Atkins, supra, 536 U.S. at 308 n. 3, 317 n. 22, 122 S.Ct. at 2245 n. 3, 2250 n. 22, 153 L.Ed.2d at 342 n. 3, 348 n. 22 (both citing without reservation the substantially similar definitions of mental retardation adopted by the American Association on Mental Retardation[10] and the American Psychiatric Association).
The judge then considered whether both the Sixth and Eighth Amendments applied to the issue at hand. In this connection, he noted recent United States Supreme Court precedent applying the Sixth Amendment to sentences that were enhanced without a finding by a jury of the facts underlying the enhancement. See, Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The judge also noted that a decision of ours construing Blakely remained under consideration by the Supreme Court. See State v. Natale, 373 N.J.Super. 226, 861 A.2d 148 (App.Div.2004), certif. granted, 182 N.J. 425, 866 A.2d 981 (2005).[11] He further noted that the Court in mandating a hearing to assess mental retardation in a post-conviction relief context in Harris III, but not finding one necessary after ruling that the defendant had not demonstrated that he was retarded, had not specifically addressed Blakely. However, the judge observed:
If, however, Blakely has any impact on the mental retardation issue, then the required hearing, as I read Harris III, may not be necessary. I presently do not have the benefit of the Supreme Court's view on this issue. If Blakely does, in fact, affect Harris III, that may mean once there is a "showing," the retardation issue would be an issue to be determined by a jury with the heavy burden upon the State.
Despite strong indications that he thought an assessment of Jimenez's mental condition raised Sixth Amendment concerns requiring jury resolution, the trial judge, influenced by Harris III, established pre-trial hearing procedures as well. He ruled that if a credible issue as to retardation were demonstrated (as here), a pre-trial hearing should take place pursuant to Harris III, at which the Rules of Evidence would apply and sworn expert testimony would be required. At that hearing, defendant would have the burden of proving his retardation. If proof of such condition were established by clear and convincing evidence, then trial would proceed as a non-capital matter. If proof were established by a preponderance of the evidence, the issue would be reserved for jury consideration at the commencement of the penalty phase, and the State would have the burden to prove, beyond a reasonable doubt, that the defendant was not retarded. If defendant's proofs fell below the preponderance standard, then *478 the issue of mental retardation would not be presented to the jury for its consideration as a potential bar, in and of itself, to execution. However, such evidence could be adduced in the penalty phase as a mitigating factor.
As we have previously noted, both the State and the defense moved for leave to appeal from the trial court's ruling. We granted both motions by orders dated March 23, 2005. The State's motion for direct certification by the Supreme Court was denied on April 13, 2005.
Before us are the following issues: (1) the standard of proof (preponderance, clear and convincing evidence, or beyond a reasonable doubt); (2) the burden of proof (State or defense); (3) the factfinder (judge or jury); and (4) the timing of the decision (pre-trial, post-guilt phase or both).[12]

E. The Parties' Positions

On appeal, the State argues that the trial judge improperly applied Sixth Amendment trial-by-jury requirements to defendant's Eighth Amendment claim, and that a jury's determination of the non-existence of mental retardation is not required. Moreover, the State contends, because the lack of retardation is not an "element" of capital murder, the burden of proof that retardation exists properly can be placed upon the defendant, who must demonstrate the condition by a preponderance of the credible evidence. The State argues that the determination should be made pre-trial, by the court, sitting without a jury. However, it contends that if a jury is employed, the burden of proof should still remain with the defendant. If the defendant fails to meet his burden of proof at the pre-trial or other hearing, then his mental status could be used only as a mitigating factor in the penalty phase. A penalty phase would be required, it contends, even if the defendant were found to be retarded, for the limited purpose of determining a defendant's eligibility for a sentence of life imprisonment without parole pursuant to N.J.S.A. 2C:11-3b(4).
In contrast, the defense argues that the fact of a defendant's mental retardation presents a jury issue under the Sixth Amendment that must be determined in a separate proceeding between the guilt and penalty phases. There, the defense contends, the State must prove, beyond a reasonable doubt, that the defendant is not mentally retarded before the case can proceed to a traditional penalty phase.
The defense agrees with the State that, initially, a pre-trial determination of the retardation issue by a judge is appropriate because a finding of retardation will result in a substantial savings of resources and time. However, it contends that a judicial determination that a defendant is not mentally retarded cannot substitute for an ultimate determination by a jury.
Both the State and the defense agree that the issue of retardation must be considered if a defendant presents a "colorable" claim of retardation pre-trial. As we have previously recognized, they agree as well as to the psychiatric standard applicable to a determination of retardation. We will therefore not discuss either of these issues further, being in substantial agreement with the parties' positions.

II.

A. Retroactivity

The parties have not addressed the issue of the retroactivity of Atkins, and that *479 subject was not addressed by the Supreme Court in its decision. However, in Penry, supra, the Supreme Court found unanimously that any decision exempting a defendant from execution on Eighth Amendment grounds as the result of mental retardation would be applied retroactively to include all cases on collateral review. 492 U.S. at 313-319, 109 S.Ct. at 2944-47, 106 L.Ed.2d at 274-78. The Supreme Court permitted consideration of Atkins issues raised on post conviction review in Harris III, supra, 181 N.J. at 520-21, 859 A.2d 364. We thus find no impediment to our consideration of the issue in connection with a pre-trial interlocutory appeal.

B. The Effect of Apprendi, Ring, Blakely, and Booker

As we have stated, the State takes a position different from the defense when it argues that the Sixth Amendment's guarantees of trial by jury are inapplicable in this Atkins context. As we will later explain, our resolution of this issue is substantially influenced not only by the United States Supreme Court's recent Sixth Amendment jurisprudence but also by the New Jersey Supreme Court's utilization of that precedent in Fortin II when determining the related issue of the necessity of presentation to the grand jury of those aggravating factors necessary to elevate murder to a capital crime.
The Sixth Amendment issue arises as the result of the United States Supreme Court's decisions in Apprendi v. New Jersey, supra, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); Blakely v. Washington, supra, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403; and United States v. Booker, ___ U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). We find throughout these decisions a consistent adherence to the principle that the existence of those facts, whether denominated statutory "elements" of a crime or not, that serve to permit an increase in the penalty imposed upon a criminal defendant must, under the Sixth Amendment, be decided by the jury upon proof beyond a reasonable doubt.
In Apprendi, defendant was convicted, following a plea of guilty, to two counts of second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a, and one count of third-degree unlawful possession of an anti-personnel bomb, N.J.S.A. 2C:39-3a. Prior to sentencing, the State moved for imposition of an extended term of imprisonment on one of the second-degree weapons convictions pursuant to the State's hate crime statute, N.J.S.A. 2C:44-3(e), which permitted enhanced sentencing by a judge in any case in which "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity."
At a pre-sentencing evidentiary hearing held to consider Apprendi's purpose in the conduct at issue, the judge determined by a preponderance of the evidence that his crime was motivated by racial bias and that his actions, consisting of firing shots at the home of a black family, were taken with a purpose to intimidate. The judge found the hate crime statute applicable to Apprendi on this basis and imposed an extended term on him.
On appeal, Apprendi argued that the racial bias that permitted sentencing above the maximum that was otherwise applicable to his second-degree weapons offense was transformed through the State's sentencing laws into the functional equivalent of an element of his weapons crime, and that the court's procedures thus violated his right under the Fourteenth Amendment *480 to due process prior to any deprivation of liberty and his right under the Sixth Amendment to have his guilt determined by a jury verdict upon proof beyond a reasonable doubt. That argument was accepted by the United States Supreme Court, which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455.
In Apprendi's case, the Court found, the hate crimes sentencing enhancement imposed a second mens rea requirement of a finding of a "purpose to intimidate" on account of, in his case, race. Id. at 492-93, 120 S.Ct. at 2364, 147 L.Ed.2d at 456-57. The Court held that "[t]he defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense `element'." Id. at 493, 120 S.Ct. at 2364, 147 L.Ed.2d at 457. Moreover, the Court noted that the finding of intent required by the hate crime statute exposed Apprendi to a greater punishment than that authorized by the jury's guilty verdict, turning a second-degree crime into a first-degree one for sentencing purposes. Id. at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457. It thus concluded, "the relevant inquiry is not of form, but of effect  does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Ibid. The Court answered that question affirmatively, thereby requiring a jury's determination beyond a reasonable doubt.
Both in terms of absolute years behind bars, and because of the more severe stigma attached, the differential here [between potential sentences of 10 and 20 years] is unquestionably of constitutional significance. When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as "a tail which wags the dog of the substantive offense."
[Id. at 495, 120 S.Ct. at 2365, 147 L.Ed.2d at 458 (quoting McMillan v. Pennsylvania, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67, 77 (1986)).]
Apprendi was followed by Ring, a more factually analogous decision that, employing Apprendi's functional analysis, held unconstitutional under the Sixth Amendment an Arizona statute that permitted a judge, sitting without a jury, to determine the presence or absence of the aggravating factors that established whether a defendant, convicted of murder, was subject to the death penalty. The Court's reasoning closely followed that of the majority in Apprendi, in that it viewed sentencing factors functionally when determining whether the Sixth Amendment's guarantees applied.[13] 536 U.S. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 577 (quoting Apprendi, supra, 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19). It held:
In Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), this Court held that Arizona's sentencing scheme was compatible with the Sixth Amendment because the additional facts found by the judge qualified as sentencing considerations, not as "element[s] *481 of the offense of capital murder." Id. at 649, 110 S.Ct. [at 3055, 111 L.Ed.2d at 525]. Ten years later, however, we decided Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which held that the Sixth Amendment does not permit a defendant to be "expose[d] ... to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." Id. at 483, 120 S.Ct. [at 2359, 147 L.Ed.2d at 450]. This prescription governs, Apprendi determined, even if the State characterizes the additional findings made by the judge as "sentencing factor[s]." Id., at 492, 120 S.Ct. at 2363-64, 147 L.Ed.2d at 456].

Apprendi's reasoning is irreconcilable with Walton's holding in this regard, and today we overrule Walton in relevant part. Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.
[536 U.S. at 588-89, 122 S.Ct. at 2432, 153 L.Ed.2d at 563-64.]
As the Court also noted:
The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years [in Apprendi], but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both. [Id. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 577.]
The United States Supreme Court's decisions in Apprendi and Ring and the functional approach to the characterization of sentence enhancements for Sixth Amendment purposes that those decisions embody constituted the foundation for the New Jersey Supreme Court's decision in Fortin II, in which the Court determined as a matter of state constitutional law that the aggravating factors set forth in N.J.S.A. 2C:11-3c(4) essentially were elements of capital murder that must be presented to a grand jury, just as evidence of their presence must be determined by a petit jury to exist, beyond a reasonable doubt, during the penalty phase of a capital proceeding.
The Fortin II Court's focus was on the necessity of the presentment to a grand jury of aggravating factors  a Fifth Amendment concern under the United States Constitution and federal law, but one determined by the Fortin Court as a matter of State constitutional law under Article 1, paragraph 8.[14] However, because its analysis turned on Apprendi and Ring, both of which essentially were Sixth Amendment petit jury cases, we find the Court's rationale of significance in the present instance.
In particular, we note the Supreme Court's construction of New Jersey's capital murder statute as accretive in nature. Although the potential for the imposition of a death penalty inheres within the statute  a point upon which the State's arguments to a large extent depend  and to that extent death constitutes the statutory "maximum" provided by N.J.S.A. 2C:11-3c, the Court did not view the statute in that fashion. Rather, it viewed the implementation of the statute as a three-step process  requiring a sequential finding of *482 (1) knowing or purposeful murder, (2) the existence of a capital trigger and (3) one or more aggravating factors that outweighed beyond a reasonable doubt any mitigating factors  before death could be imposed. 178 N.J. at 634-35, 843 A.2d 974.
Because each step serves to increase the potential penalty, the Fortin II Court held that under Apprendi and Ring "[t]he jury" and not the court, "must find a capital trigger and an aggravating factor to elevate the punishment from a term of imprisonment to death." Id. at 636, 843 A.2d 974 (emphasis supplied). Abrogating its prior holding in Martini I, the Court held that the aggravating factors  and presumably the capital triggers  do not merely enlarge the available sentencing options for certain defendants, as the State has argued here. Id. at 637, 843 A.2d 974 (quoting State v. Martini, 131 N.J. 176, 224, 619 A.2d 1208 (1993) (Martini I)). The Fortin II Court acknowledged Apprendi's holding that the "relevant inquiry is one not of form, but of effect  does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Id. at 641, 843 A.2d 974 (quoting Apprendi, supra, 530 U.S. at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457).[15]
Since Fortin, the United States Supreme Court has also decided Blakely, holding there that a Washington judge violated defendant's Sixth Amendment rights when he sentenced him to a term greater than the maximum he could have otherwise imposed as the result of his determination that in defendant's manner of kidnapping his wife, defendant had acted with "deliberate cruelty"  a fact neither admitted by the defendant nor found by a jury. 542 U.S. at ___, 124 S.Ct. at 2537, 159 L.Ed.2d at 413.
Our precedents make clear . . . that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. ... In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.
[Id. at ___, 124 S.Ct. at 2537, 159 L.Ed.2d at 413-14 (quoting 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872)).]
In language upon which the trial court relied in the present matter in suggesting that a Sixth Amendment right exists, the Blakely Court justified its decision by noting that Apprendi had held: "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment."[16]Blakely, *483 supra, 542 U.S. at ___, 124 S.Ct. at 2543, 159 L.Ed.2d at 420 (citing Apprendi, supra, 530 U.S. at 466, 120 S.Ct. at 2348, 147 L.Ed.2d at 435). See also Natale, supra, 373 N.J.Super. at 234, 861 A.2d 148 (quoting this statement from Blakely and holding that a court's imposition of a sentence above the presumptive violates the requirements of that case), aff'd in part and rev'd in part, 184 N.J. 458, 878 A.2d 724 (2005) (Natale II) (avoiding Sixth Amendment prohibitions, in part, by construing the New Jersey Criminal Code so as to eliminate presumptive terms). See also State v. Abdullah, 184 N.J. 497, 878 A.2d 746 (2005) (remanding for resentencing on burglary conviction in light of Natale II but affirming life sentence for murder and accompanying parole disqualifier as not implicating Sixth Amendment concerns); State v. Franklin, 184 N.J. 516, 878 A.2d 757 (2005) (vacating extended sentence imposed pursuant to the Graves Act when based upon judicial factfinding utilizing preponderance of evidence standard).
The Blakely Court continued, in discussing the enhanced punishment imposed for the lesser crime of kidnapping before it:
The Framers would not have thought it too much to demand that, before depriving a man of three more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to "the unanimous suffrage of twelve of his equals and neighbours," rather than a lone employee of the State.
[Blakely, supra, 542 U.S. at ___, 124 S.Ct. at 2543, 159 L.Ed.2d at 420 (quoting 4 W. Blackstone, Commentaries on the Laws of England, at 343 (1769)).]
See also Booker, supra, ___ U.S. at ___, 125 S.Ct. at 756, 160 L.Ed.2d at 650 (applying the principles of Apprendi and Blakely to the Federal Sentencing Guidelines and holding that: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."); Natale, supra, 373 N.J.Super. at 235-36, 861 A.2d 148.

III.
We agree with the trial court that as a matter of federal constitutional law as it may be construed by the United States Supreme Court, a determination of what procedures are required under Atkins is not as clear as we would prefer. In particular, we note the fact that Atkins left the formulation of procedures to the states, and expressed no opinion as to the constitutionality of existing legislation on the subject. It thus may be, as commentators and courts have suggested, that the issue is as wide open as it appears to be.[17] The fact that Ring was decided four days after Atkins, yet Ring's proscriptions are no where foreshadowed in Atkins has likewise been cited as evidence that the United States Supreme Court does not view the absence of retardation, once the issue of its *484 existence is raised, as an issue subject to the Sixth Amendment. However, it is equally possible that the Court simply adopted in this context the more measured approach to constitutional adjudication advocated by Justice O'Connor in her dissent in Apprendi, supra, 530 U.S. at 525, 120 S.Ct. at 2381, 147 L.Ed.2d at 476 and, since not faced with the constitutional issue, did not decide it.
Whether the federal constitution as interpreted in the future by the United States Supreme Court would compel a determination by the jury that Jimenez is not mentally retarded prior to imposition of the death penalty is, however, a subject that we believe can be left for another day, since we regard the reach of New Jersey's constitution as sufficient to embrace the essential principles of Apprendi, Ring, Blakely, and Booker and to require their application in this Atkins context.[18] This extension, we find, is not precluded by prior decisions, none of which construed art. I, ¶ 9 in the present context. See State v. Stanton, 176 N.J. 75, 88, 820 A.2d 637 (2003); State v. Whalen, 235 N.J.Super. 506, 517, 563 A.2d 457 (App.Div.1989) (Baime, J. concurring). We read Atkins, as implemented under this State's statutory scheme, as transforming mental retardation from solely a mitigating factor to the functional equivalent of a capital trigger, since death can be imposed only upon those who are not retarded.[19]
We are also persuaded that if, as the Apprendi line of cases dictates, Jimenez has the right to insist that the State prove to a jury all facts legally essential to his punishment, once the issue is raised, the fact that he is not retarded must be proven in like fashion.[20] This is so because the existence of a capital trigger constitutes a threshold determination of fact forming a condition precedent to the imposition of a death sentence, similar to the aggravating factors that were the subject of Ring and, in a non-capital context, the sentencing factors considered in Apprendi, Blakely, and Booker. See State v. Loftin, 146 N.J. 295, 349, 680 A.2d 677 (1996) (N.J.S.A. 2C:11-3c imposes a triggering device for the death penalty  an additional requirement that renders the defendant death-eligible). Thus its effect is to act as a sentencing enhancer under the interpretation of our capital sentencing scheme adopted in Fortin II. Although a lack of retardation would not constitute a threshold consideration in every case (or indeed, in most cases), when a defendant's mental status has been placed in issue, as here, we *485 find a clear right on the part of a defendant to insist that a jury determine whether he is mentally retarded and thus whether that threshold to the imposition of a death sentence can be met, or whether he is barred from execution.
In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), together with Ring, requires as a matter of due process, that the absence of retardation be established by the State beyond a reasonable doubt. See also, e.g., State v. Stanton, 176 N.J. 75, 87-88, 820 A.2d 637 (2003).
Such a determination, we find, should be made in the second phase of a capital murder trial, immediately following a determination of defendant's guilt. The same jury should be utilized. State v. Chenique-Puey, 145 N.J. 334, 343, 678 A.2d 694 (1996); State v. Ragland, 105 N.J. 189, 195, 519 A.2d 1361 (1986). The jury must be informed of the consequences of its decision including the likely term of imprisonment if defendant is found to be mentally retarded and, if the matter is to proceed as a capital prosecution, the jury must determine unanimously and beyond a reasonable doubt that the defendant is not mentally retarded.
The Court has previously held in a double jeopardy context that the requirement of the death penalty statute that the murder be by defendant's "own conduct" does not constitute an "element" of the crime of murder, but rather a "triggering device." State v. Cruz, 171 N.J. 419, 426-27, 794 A.2d 165 (2002). See also State v. Gerald, 113 N.J. 40, 100, 549 A.2d 792 (1988). We do not regard those decisions as precluding our present interpretation, since in neither case was the issue that we address specifically raised.

IV.
We find as well as a matter of public policy that the risk of errorof putting to death one who should rightfully be constitutionally exemptis too great for any burden of proof to be placed upon the defendant and for the determination of death qualification to be made by the trial judge, as it is in some states.[21] For if Jimenez or any other capital defendant is in fact retarded, the whole purpose for the imposition of the death penalty is lost, since as Atkins recognizes, it provides neither effective deterrence nor retribution and has been determined to be inhumane. As the Court noted in Ring, Arizona had suggested in that case that a judicial determination *486 of aggravating factors might be a better guarantee against the arbitrary imposition of the death penalty. However, the Court stated:
Entrusting to a judge the finding of facts necessary to support a death sentence might be
"an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. . . . The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free."
[Ring, supra, 536 U.S. at 607, 122 S.Ct. at 2442, 153 L.Ed.2d at 514[576] (quoting Apprendi, supra, 530 U.S. at 498, 120 S.Ct. at 2367, 147 L.Ed.2d at 459-60 (Scalia, J. concurring)).]
Moreover, the Ring court observed, the superiority of judicial factfinding in capital cases is far from evident. Id. at 607-08, 122 S.Ct. at 2442, 153 L.Ed.2d at 576. That twenty-nine out of thirty-eight states that permit capital punishment generally entrust sentencing decisions to juries was cited by the Court as circumstantial evidence of that fact. Id. at 608 n. 6, 122 S.Ct. at 2442 n. 6, 153 L.Ed.2d at 576 n. 6.
The Blakely Court held in invalidating the Washington court's sentence in light of Apprendi:
Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.... Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.
[Blakely, supra, 542 U.S. at ___, 124 S.Ct. at 2538-39, 159 L.Ed.2d at 415.]
A review of New Jersey's capital sentencing scheme discloses the Legislature's determination to entrust all factual findings required for imposition of the death sentence to a jury, and not to the court. See also, e.g. Witherspoon v. Illinois, 391 U.S. 510, 519-20, 88 S.Ct. 1770, 1775-76, 20 L.Ed.2d 776, 783 (1968) (entrusting jurors in death penalty cases to express the conscience of the community on the ultimate question of life or death). It would thus be anomalous to increase the court's power in this one instance, while diminishing that of the jury.[22]
It has been argued that such a shift is justified in this circumstance because, as recognized in Atkins, mentally retarded individuals may be poor witnesses, may not be perceived as exhibiting remorse, and may be regarded by a jury as posing a greater risk of future dangerousness. Atkins, supra, 536 U.S. at 321, 122 S.Ct. at 2252, 153 L.Ed.2d at 350. However, nothing *487 in Atkins indicates that a single judge is better equipped than a jury to recognize and consider the deficiencies of a retarded person or to assess his future dangerousness. We thus view the jury not as an impediment but as an important bulwark standing between the individual defendant and the power of the government to execute him. See Booker, supra, ___ U.S. at ___, 125 S.Ct. at 752, 160 L.Ed.2d at 645. Moreover, we regard the existence of the due process and perceptual problems recognized in Atkins as providing a practical ground for raising the level of proof from a preponderance of the evidence to one of beyond a reasonable doubt, thereby providing added assurance to the jury's verdict.
In a concurring opinion in In re Winship, supra, Justice Harlan discussed the State's burden of proof in a different context, but nonetheless in terms of relevance here. He stated:
As Mr. Justice Brennan wrote for the Court in Speiser v. Randall, 357 U.S. 513, 525-526, 78 S.Ct. 1332, 1341-1342, 2 L.Ed.2d 1460 (1958):
`There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending valueas a criminal defendant his libertythis margin of error is reduced as to him by the process of placing on the other party the burden * * * of persuading the fact-finder at the conclusion of the trial of his guilt beyond a reasonable doubt.'
In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.
[397 U.S. at 372, 90 S.Ct. at 1076-77, 25 L.Ed.2d at 380.]
Here, where the consequences of error are so immeasurably more severe, we accord the Justice's comments added weight.

V.
As the defense recognizes, placing the burden upon the State to demonstrate to a jury beyond a reasonable doubt that Jimenez is not mentally retarded is consistent with the State's treatment of diminished capacity. See State v. Delibero, 149 N.J. 90, 692 A.2d 981 (1997). See also State v. Breakiron, 108 N.J. 591, 532 A.2d 199 (1987). Although as the State notes, insanity is an affirmative defense that must be proven by a defendant by a preponderance of the credible evidence, a claim of diminished capacity operates differently. "A jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime." Delibero, supra, 149 N.J. at 98, 692 A.2d 981 (citing State v. Harris, 141 N.J. 525, 555, 662 A.2d 333 (1995)).
Although the State argues otherwise, we find a claim of mental retardation to more closely resemble that of diminished capacity than insanity. "Diminished capacity describes a disease or defect of mind that may negate the mental state that is an element of the offense charged" whereas "[t]he insanity defense exculpates an actor from guilt for conduct that would otherwise be criminal." Delibero, supra, 149 N.J. at 92-93, 692 A.2d 981. Although mental retardation, at least as asserted by one competent to stand trial, does not negate a defendant's state of mind, and he may still be found guilty of knowing or purposeful murder, it does negate a trigger essential to the imposition of the penalty of death and to that extent is similar. Rather than negating a *488 mental condition to the crime, it negates a mental condition necessary to the implementation of the extreme penalty of deaththe ability to appreciate the deterrent and retributive purposes of capital punishment. Mental retardation differs markedly from insanity in this regard, since insanity absolves a defendant from guilt, whereas mental retardation merely absolves a defendant from a form of punishment. Mental retardation, as we have previously demonstrated, can no longer be viewed as exculpatory, as insanity is viewed, or solely as a factor in mitigation of sentence.[23]
We recognize as well that the procedures that we have adopted are consistent with those recommended, following considered study, by the Trial Judges Committee on Capital Causes. See Judges Bench Manual for Capital Causes at 65-74 (January 1, 2005).

VI.
As a final matter, we turn to the trial court's pre-trial procedures for the implementation of Atkins. The court proposed that when a colorable claim of mental retardation had been made, the issue of its existence would be considered by the court prior to trial in a hearing to which the Rules of Evidence would apply. Unlike the post-guilt phase proceedings that the court also proposed, here, the defendant would have the burden of proof, which if met by clear and convincing evidence, would eliminate the necessity of a penalty phase. If met only by a preponderance of the evidence, the issue would then be reserved for the jury's consideration under Sixth Amendment standards after the guilt phase. If lesser proof were found by the court to exist, the defendant could only utilize his mental status as a traditional mitigating factor in the penalty phase of his trial.
It is here that we disagree with that court's thoughtful analysis, finding that the hearing procedures of Harris III upon which the trial court's decision appears to have depended were proposed in a different, post-conviction relief context, and that a hearing and factfinding of the sort envisioned by the judge have no place in a case in which a claim of mental retardation is raised prior to trial. We regard the court's concern that the specter of execution not hang over a defendant unnecessarily and that the cost of a capital prosecution be minimized when possible to have been both rationally and humanely founded. Thus, we find that if reasonable minds could not differ as to the existence of a defendant's mental retardation, that determination should be made as early in the proceeding as practicable. However, we doubt that such a circumstance will arise among those defendants (who we assume will at most be mildly retarded) that a prosecutor will seek to prosecute capitally, because the difficulty of applying the DSM-IV's adaptive skill factors will in all likelihood lead to divergent views of a defendant's mental capacity.
Because we have determined that when the contrary is asserted, the fact that a capital defendant is not mentally retarded constitutes a triggering event with constitutional implications, we cannot in any other circumstance, consistent with constitutional principles, permit a shift in the burden of proof, a change in the degree of proof,[24] or the substitution of a judge as *489 factfinder for a jury. The constitution does not permit a judge to function as a gatekeeper in this context.
As a practical matter, we note as well the State's argument that regardless of the result of a pre-trial hearing, a weighing of aggravating and mitigating factors in a penalty phase proceeding may be required in order to determine whether a life sentence without parole should be employed. Further, we have concerns that a pretrial determination of mental condition will inevitably lead to motions for leave to appeal by the disappointed party and a likelihood of fractionated appellate review that would be eliminated if all guilt and sentencing issues were considered together following the jury's verdict.

VII.
In summary, we reverse the order of the trial court as it relates to pre-trial procedures designed to resolve the issue of whether Jimenez is mentally retarded, finding that a judge can make that decision pre-trial only in those rare occasions in which reasonable minds cannot differ as to the existence of retardation. We affirm his order as it relates to proceedings after the guilt phase, finding on state constitutional and policy grounds that when the issue of retardation has been properly raised, the lack of retardation functions in a manner similar to a triggering factor to be determined by a jury in the second, post-guilt, phase of a capital prosecution, with the State bearing the burden of proof beyond a reasonable doubt. Even if the defendant is found by a jury not to be mentally retarded, evidence of his mental status can be introduced as a mitigating factor.
The court's order is thus affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.
FISHER, J.A.D., concurring.

I
Georgia's 1986 execution of Jerome Bowden, a mildly retarded African American whose school records indicated he had a low IQ, caused such public outrage that Georgia  a willing participant[1] in the death penalty experiment commenced when the Supreme Court lifted its moratorium in 1976[2]  became the first death penalty state in the Nation to prohibit the execution of mentally retarded persons. Atkins v. Virginia, 536 U.S. 304, 313 n. 8, 122 S.Ct. 2242, 2248 n. 8, 153 L.Ed.2d 335, 345 n. 8 (2002). Georgia's reversal in attitude provoked other states to follow suit  a chain reaction that caused the Supreme Court to overrule Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and conclude in Atkins that Eighth Amendment standards had evolved to the *490 point of precluding the execution of mentally retarded defendants.[3]
In so holding, however, the Supreme Court then imposed no parameters on how a state may constitutionally adjudicate whether an accused's level of intelligence is high enough to render him or her eligible for execution. Instead, the Court left it to the states, in the first instance, to create processes for the adjudication of mental retardation claims. Having granted the motions of both the State and defendant for leave to appeal the order of March 7, 2005  an order which memorialized the trial judge's laudable efforts at constructing sensible parameters for the Atkins adjudication required in this case  we resolved to "tinker with the machinery of death," Callins v. Collins, 510 U.S. 1141, 1145, 114 S.Ct. 1127, 1130, 127 L.Ed.2d 435, 438 (1994) (Blackmun, J., dissenting), and determine how a trial court may constitutionally adjudicate the presence or absence of this death-disqualifying characteristic.
This unenviable task is made particularly difficult by the fact that, unlike most other state legislatures, our Legislature has not amended the capital murder statute, N.J.S.A. 2C:11-3, despite the fact that Atkins renders it overly broad. Accordingly, we are required to engage in what some may critically refer to as "judicial activism," an enterprise that is, in this circumstance, and quite often others, unavoidable. We are not permitted the luxury of inaction; we are obligated to establish a procedure by which defendant's claim of mental retardation may be constitutionally adjudicated because defendant stands in the dock accused of murder, and because the State insists upon taking his life if he is convicted.
I agree with my colleagues that (a) the State must be put to the burden of proving the absence of mental retardation when a colorable issue is presented; (b) the State's burden is to prove the absence of mental retardation beyond a reasonable doubt; (c) the jury must be the factfinder; and (d) a defendant may never be put to any burden of persuasion at any pretrial proceeding concerning the issue. I write separately, however, to emphasize that I believe our judgment is required in all respects by the federal constitution.

II

A. Assigning the burden of persuasion to the State.
In holding that the State must bear the burden of proving the absence of mental retardation, the majority has thoroughly and forcefully described the requirements of the Sixth Amendment as outlined in Apprendi v. New Jersey, 530 U.S. 466, 120 *491 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, ___ U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). These authorities demonstrate that the Sixth Amendment, as well as art. I, ¶ 9 of our state constitution, requires that the State bear the burden of proving that this defendant is not mentally retarded.[4]

B. Defining the burden of persuasion as requiring proof of the absence of mental retardation beyond a reasonable doubt.
The level of proof that the State must meet  proof beyond a reasonable doubt  is also required by the federal and state constitutions. In recent non-capital cases, the Supreme Court held that the Sixth Amendment requires that facts which would increase a sentence by years had to be proven beyond a reasonable doubt because of the serious loss of liberty at stake. See Booker, supra, ___ U.S. at ___, 125 S.Ct. at 756, 160 L.Ed.2d at 650; Blakely, supra, 542 U.S. at ___, 124 S.Ct. at 2536, 159 L.Ed.2d at 412; Apprendi, supra, 530 U.S. at 490, 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455. Accord Natale II, supra, 184 N.J. at 473-75, 878 A.2d 724; Franklin, supra, 184 N.J. at 530-32, 878 A.2d 757; Abdullah, supra, 184 N.J. at 498-99, 504-05, 878 A.2d 746. It inexorably follows from these authorities that the enormity of imposing a death sentence instead of a prison term also requires that the State prove beyond a reasonable doubt that the defendant is not mentally retarded. Since the Supreme Court has now construed the Eighth Amendment in a manner that precludes the execution of mentally retarded defendants, it would be incomprehensible to assume that either the federal or state constitutions would authorize the execution of an individual even if the factfinder harbored a reasonable doubt about whether that individual was mentally retarded.
While many of the death penalty states have imposed lesser standards in response to the Atkins mandate, I agree with my colleagues that the State must be held to the burden of proving the absence of mental retardation beyond a reasonable doubt. Considering this defendant's low IQ, as recognized by both his and the State's expert, and his likely limited ability to assist in his defense at either the guilt or sentencing phases  and considering that the imposition of death is irrevocable  I believe that the federal and state constitutions *492 require that a defendant may be found eligible for a death sentence only through the application of the criminal justice system's highest standard of proof.
Indeed, I also believe we can infer from N.J.S.A. 2C:11-3 that the Legislature, if it had acted in this regard, would have imposed the reasonable doubt standard upon the State. Nothing in this statute suggests that defendant is required to prove anything during a death sentence proceeding, nor is there anything in the statute to suggest that the State is permitted to prove any factor that would render a defendant eligible for a death sentence by a standard any less rigorous than the reasonable doubt standard.[5] Accordingly, I am convinced that if the Legislature were to act to conform N.J.S.A. 2C:11-3 to the requirements of Atkins, it would recognize its obligation to adopt the standards we have imposed in order to adhere to the requirements of the federal and state constitutions.

C. Identifying the jury as the constitutionally-required factfinder.
I would also conclude that our holding that the Atkins issue should be decided by a jury is not only compelled by N.J.S.A. 2C:11-3 and State v. Fortin, 178 N.J. 540, 634-35, 843 A.2d 974 (2004), but also, in my view, by the Sixth Amendment. In Apprendi, the Court explained the historical position of the jury as a protection constitutionally available to the individual against the strong forces of the State.[6] 530 U.S. at 477, 120 S.Ct. at 2356, 147 L.Ed.2d at 447 ("To guard against a spirit of oppression and tyranny on the part of our rules and as the great bulwark of our civil and political liberties, trial by jury has been understood to require that the truth of every accusation ... should afterwards be confirmed by the unanimous suffrage of twelve of the defendant's equals and neighbors."); accord In re Winship, 397 U.S. 358, 362, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368, 374 (1970) ("This notion  basic in our law and rightly one of the boasts of a free society  is a requirement and a safeguard of due process of law in the historic, procedural content of `due process.'"). This was recognized very recently by our Supreme Court. Natale II, supra, 184 N.J. at 472-73, 878 A.2d 724; Franklin, supra, 184 N.J. at 530-32, 878 A.2d 757. While the Apprendi Court stated that its holding did not alter capital sentencing schemes, 530 U.S. at 496, 120 S.Ct. at 2366, 147 L.Ed.2d at 459, that untenable distinction was short-lived and the Court soon thereafter held in Ring that juries and not judges are required to find the aggravating factors necessary to sentence a defendant to death. 536 U.S. at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564 ("Capital defendants, no less than noncapital defendants, . . . are entitled to a *493 jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). Since mental retardation constitutes more than an aggravating factor  it is instead a capital trigger, as the majority holds and in which I join  I can find no principled reason why we should decline to state that Ring compels, on Sixth Amendment grounds, that it is the jury which must determine whether defendant is mentally retarded. Once a substantive constitutional right is recognized, the states must enforce that right with procedures adequately designed to guarantee its protections. In my view, that approach compels the defendant's right to have this issue resolved by a jury. Thus, I would fix our holding to the Sixth Amendment and to our state constitution, and not the "public policy" enunciated by the majority.

D. The trial judge's proposed pre-guilt phase hearing.
As for the pretrial procedures outlined by the trial judge, I would conclude that since, here, the State concedes that defendant has raised a colorable issue of mental retardation, we need not further consider what types of inquiries a trial judge may pursue at a pretrial stage in other cases. Because defendant's contention that he is mentally retarded is arguable, as the expert opinions in the record indicate and as the State concedes, there is no need for a pre-trial proceeding to further adjudicate its sufficiency; defendant is entitled to have this issue resolved at trial. However, I would agree with my colleagues that if, in an appropriate case, there should be some pretrial inquiry into the subject, then the burden of persuasion  in any degree  should never be placed on the defendant.

III
In the final analysis, our ruling must be premised on the fact that the criminal justice system was created and is administered by human beings. For that reason, the system must be presumed capable of producing erroneous results. As Judge Learned Hand famously stated, "[o]ur procedure has always been haunted by the ghost of the innocent man convicted. It is an unreal dream." United States v. Garsson, 291 F. 646, 649 (S.D.N.Y.1923). Far more disturbing is the specter that a mistaken conviction could lead to the execution of an innocent person. Yet, it seems to be accepted that such events have occurred and Judge Hand's ghost walks the land. In concluding that the death penalty was incapable of being constitutionally administered, Justice Blackmun observed that "[i]nnocent persons have been executed." Callins, supra, 510 U.S. at 1159 n. 8, 114 S.Ct. at 1138 n. 8, 127 L.Ed.2d at 449 n. 8[7]. See also Furman, supra, 408 U.S. at 367-68, 92 S.Ct. at 2792, 33 L.Ed.2d at 422-23 (Marshall, J., concurring) ("We have no way of judging how many innocent persons have been executed but we can be certain that there were some."); http://www.deathpenaltyinfo.org/state (last visited August 2, 2005) (asserting that since 1973, 119 inmates have been released from death row as a result of the production of evidence of their innocence, suggesting the statistical likelihood that others have not been so fortunate); Scheck, Neufeld and Dwyer, Actual Innocence (Signet 2001) at 281-82 ("[E]ighty-eight condemned men and women have been *494 released from death row, and ultimately had their convictions vacated forever. For every seven executed, one innocent person is freed, not only from death row but from incarceration."). Even death penalty proponents acknowledge that the criminal justice system is capable of producing the mistaken conviction and execution of innocent defendants. See van den Haag, The Ultimate Punishment: A Defense, 99 Harv. L.Rev. 1662, 1664 (1986) ("I do not doubt that, over a long enough period, miscarriages of justice will occur even in capital cases."). Added to the occasional fallibility of the criminal justice system is the unresolved question of whether the Supreme Court of the United States considers the execution of a defendant who asserts a tardy claim of "actual innocence" to be of constitutional dimension, Herrera, supra, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203  a fact that should generate doubts about whether appellate and habeas corpus review are sufficient safety nets for the catching of all miscarriages.[8] Thus, in designing procedures for the constitutional adjudication of a capital trigger such as the absence of mental retardation, we must accept as a fact of life that our criminal justice system is not perfect and that appellate or habeas review is not guaranteed to detect  or that it will always endeavor to detect[9]  all mistaken adjudications.
If our federal and state constitutions should be construed as permitting man-made institutions to impose the God-like penalty of death  an interpretation with which I may disagree, as have others,[10] but *495 to which I am bound to adhere  it nevertheless remains a matter of constitutional imperative that the greatest of care must be taken to insure that the death penalty is not imposed in unauthorized circumstances or in an arbitrary, discriminatory or capricious manner. As Justice Stewart recognized in Furman,
The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
[408 U.S. at 306, 92 S.Ct. at 2760, 33 L.Ed.2d at 388 (concurring opinion).]
As a result of the uniqueness and irrevocability of the death penalty, those facts that permit the State to take the life of the accused may be resolved only by a process that requires the State to prove to a jury, beyond a reasonable doubt, that the accused is not mentally retarded.
Since the federal constitution "`places a substantive restriction on the State's power to take the life' of a mentally retarded offender," Atkins, supra, 536 U.S. at 321, 122 S.Ct. at 2252, 153 L.Ed.2d at 350 (emphasis added) (quoting Ford, supra, 477 U.S. at 405, 106 S.Ct. at 2599, 91 L.Ed.2d at 344), the application of any lesser standards than those required by today's judgment, in my view, would violate the Sixth, Eighth and Fourteenth Amendments, as well as art. I, ¶ ¶ 9 and 12 of our own state constitution. The qualitative difference between a lengthy prison term, on the one hand, and the penalty of death, on the other  let alone the enormity of the latter  militates, as a matter of federal and state constitutional imperative, that the State be put to the most rigorous standards in seeking to prove that a defendant is not mentally retarded and, thus, eligible to be executed. See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989 (1978) (plurality opinion) ("[The] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976) (plurality opinion of Stewart, Powell and Stevens, JJ.) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. . . . [T]here is a corresponding difference in *496 the need for reliability in the determination that death is the appropriate punishment in a specific case."); State v. Ramseur, supra, 106 N.J. at 368, 524 A.2d 188 (Handler, J., dissenting) ("[D]eath is different in kind from other forms of punishment and thus demands heightened procedural safeguards in sentencing."). While it may continue to be legitimately questioned whether the death penalty can ever be administered with the precision its irrevocability warrants,[11] it seems abundantly clear to me that assigning the State the burden of proving to a jury the absence of mental retardation beyond a reasonable doubt is necessary because mentally retarded defendants "in the aggregate face a special risk of wrongful execution." Atkins, supra, 536 U.S. at 321, 122 S.Ct. at 2252, 153 L.Ed.2d at 350. Any lesser procedural safeguards than those we have imposed increase the likelihood of unjust and inaccurate adjudications that our federal and state constitutions, and the standards of decency embodied in those living and evolving documents, cannot tolerate.[12]
NOTES
[1] Bills to govern the procedures for assessing mental retardation and to amend the New Jersey Constitution to bar the death penalty for the mentally retarded have been introduced in the New Jersey Legislature, but have never been released from committee. We do not find it necessary to comment on their content.
[2] In State v. Harris, 181 N.J. 391, 520-533, 859 A.2d 364 (2004), the Court had considered a post-Atkins claim for post-conviction relief on the ground of alleged mental retardation. However, the procedural context there was markedly different. Moreover, because the Court found that defendant was not mentally retarded, it did not address in detail the procedures applicable in that distinguishable setting.
[3] At the time of the decision in Atkins, the federal government and eighteen states permitting capital punishment (twelve do not) had enacted statutes that precluded the imposition of such punishment on the mentally retarded. The Texas Legislature had passed such a bill, but it was conditionally vetoed. Additionally one legislative house had passed such legislation in Virginia and Nevada. Atkins, supra, 536 U.S. at 314-15 and n. 9-17, 122 S.Ct. at 2248-49 and n. 9-17, 153 L.Ed.2d at 345-47 and n. 9-17. Since then, eight additional states have enacted similar legislation. The statutes are cited in n. 20.
[4] Poignant examples of the responses of mentally retarded defendants to execution appear in Jonathan L. Bing, Protecting the Mentally Retarded from Capital Punishment: State Efforts Since Penry and Recommendations for the Future, 22 N.Y.U. Rev. L. & Soc. Change, 59, 60-62 (1996).
[5] Defendant must have committed the act by his own conduct, have procured the commission of the offense by payment or the promise of payment, been the leader of a drug trafficking network who, in furtherance of a conspiracy commanded the offense, or committed the crime of terrorism, during which the murder occurred. N.J.S.A. 2C:11-3c.
[6] The State claimed that the following factors, enumerated in N.J.S.A. 2C:11-3c(4)(a)-(l) were present: (c) the murder was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated assault or torture; (f) the murder was committed to escape detection for another offense; (g) the murder was committed while defendant was engaged in kidnapping or an attempt to commit a sexual assault or both; and (k) the victim was less than fourteen years of age.
[7] In Harris III, the Supreme Court held that a defendant who established a basis for the belief that he was mentally retarded as grounds for post-conviction relief sufficient to warrant further inquiry was entitled to present the opinions of his own psychological expert on the issue, and that he could not be limited to the opinions of a court-appointed expert. 181 N.J. at 520-528, 859 A.2d 364. The Court did not address the State's right to present the opinions of its own expert. However, the Court's recognition that, in capital proceedings, the "factfinding procedures [must] aspire to a heightened standard of reliability," compels the conclusion that each party must be given the same opportunity to present evidence. Id. at 525, 859 A.2d 364 (quoting Ford, supra, 477 U.S. at 411, 106 S.Ct. at 2602, 91 L.Ed.2d at 347). See also N.J.S.A. 2C:11-3c(2)(d) ("The State and the defendant shall be permitted to rebut any evidence presented by the other party at the sentencing proceeding").
[8] The test is known as the Escala De Inteligencia De Weschler Para Adultos  III and is the Spanish version of the Weschler Adult Intelligence Scale  III (WAIS-III).
[9] Evaluation by either the State or the defense of defendant's adaptive skills has been complicated by the fact that defendant spent his formative years in his native country of Honduras and by difficulties in communicating meaningfully with his friends and relatives there.
[10] Mental Retardation: Definition, Classification, and Systems of Supports 1 (Ruth Luckasson ed., 10th ed.2002).
[11] Our decision was affirmed in part and reversed in part on August 2, 2005. See State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005) (Natale II). See also the companion cases of State v. Abdullah, 184 N.J. 497, 878 A.2d 746 (2005) and State v. Franklin, 184 N.J. 516, 878 A.2d 757 (2005).
[12] We do not address what procedural modifications may be made if defendant, with the prosecutor's consent, waives a jury trial in the penalty phase pursuant to N.J.S.A. 2C:11-3c(1). See State v. Di Frisco, 118 N.J. 253, 275, 571 A.2d 914 (1990); State v. Bey, 112 N.J. 123, 161, 548 A.2d 887 (1988).
[13] We find it to be irrelevant that, in Schriro v. Summerlin, 542 U.S. 348, ___, 124 S.Ct. 2519, 2524, 159 L.Ed.2d 442, 449-50 (2004) the Court declined to apply Ring retroactively to matters on collateral review because Ring did not recognize new elements within the crime of murder, but merely declared aggravating factors to function effectively like elements, thereby rendering Ring's change in the law procedural rather than substantive. The fact remains that Ring recognized the applicability of the Sixth Amendment to sentencing factors akin to the trigger we consider here.
[14] See Alexander v. Louisiana, 405 U.S. 625, 633, 92 S.Ct. 1221, 1226-27, 31 L.Ed.2d 536, 543 (1972) (Although Due Process Clause of the Fifth Amendment guarantees a defendant a fair trial, "it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury.")
[15] Fortin II does not, as the State suggests, mandate that a grand jury find that a defendant is not mentally retarded. Although akin to a trigger, the issue of retardation is unlikely to arise in a pre-indictment context. Further, the possibility of retardation need not be presented to a grand jury as exculpatory evidence unless it clearly serves to negate defendant's knowing or purposeful state of mind. An intent to commit a crime is different conceptually from the concepts of personal culpability upon which Atkins depends.
[16] The trial court continued:

Absent Blakely, the argument that mental retardation is not an element of the crime of capital murder, or that it is not the functional equivalent of an element of the offense, and thus the State should not be required to prove its absence to a jury beyond a reasonable doubt, is somewhat more forceful. However, Blakely does exist and I have referenced the Blakely quote contained in Natale, which has greatly influenced me.
The trial court's determination that, once Jimenez had demonstrated by a preponderance of the credible evidence that he was retarded, the burden of proof lay with the State to demonstrate to a jury by proof beyond a reasonable doubt that he was not retarded was the result.
[17] A particularly comprehensive analysis of Atkins can be found in Peggy M. Toblowsky, Atkins Aftermath: Identifying Mentally Retarded Offenders and Excluding Them from Execution, 30 J. Legis. 77 (2003). See also, e.g., Note, Implementing Atkins, 116 Harv. L.Rev. 2565 (2003).
[18] Because we decide this matter of state constitutional grounds, we need not address whether Cabana v. Bullock, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), upon which the State relies for the proposition that death penalty triggers need not be found by a jury, retains any precedential value in light of the Apprendi line of cases. But see Ring, supra, 536 U.S. at 598-604, 122 S.Ct. at 2437-41, 153 L.Ed.2d at 569-74.
[19] For that reason, we do not regard footnote 16 in Apprendi, a footnote frequently cited by courts and commentators rejecting the applicability of the Sixth Amendment to Atkins hearings, as persuasive evidence here. That footnote distinguishes between aggravating and mitigating factors for Sixth Amendment purposes and asserts that the Sixth Amendment applies only to the former. However, in light of Atkins, we view the lack of mental retardation as a trigger, and the presence of retardation to constitute more than merely a mitigating factor.
[20] We find some validity in the State's argument that it will have less access than a defendant to the underlying evidence necessary to establish that defendant's mental status. However, that balance can in large measure be procedurally righted by the trial court as it is in other instances in which the State bears a reverse burden of proof. We do not regard any remaining imbalance of sufficient concern to overcome constitutional mandates.
[21] Mental retardation is directed to be determined by the court in the following state statutes: Ariz.Rev.Stat. § 13-703.02(g); Colo. Rev.Stat. § 18-1.2-1102(3); Del.Code Ann. tit. 11 § 4209(d)(3)(c); Fla. Stat. Ann. § 921.137(4); Idaho Code § 19-2515A(2), (3); Ill. Comp. Stat. ch. 725 § 5/114-15(b); Ind. Code § 35-36-9-5; Kan. Stat. Ann. § 21-4623(b); Ky.Rev.Stat. 532.135; Neb.Rev.Stat. § 28-105.01(4); Nev. Rev. St. 174.098(6); N.M. Stat. Ann. § 31-20A-2.1(C); N.Y.Crim. Proc. Law § 400.27(12)(a); S.D. Codified Laws § 23A-27A-26.3; Tenn.Code Ann. § 39-13-203(c); Utah Code Ann. § 77-15a-104(11)(a); Wash. Rev.Code § 10.95.030(2). See also Hall v. State, 160 S.W.3d 24 (Tex.Crim.App.2004). Cf. Morrow v. State, ___ So.2d ___, 2004 WL 1909275 (Ala.Crim.App.2004).

Mental retardation is directed to be determined at least in part by the jury in the following state statutes: Ark.Code Ann. § 5-4-618(d)(2)(A); Cal.Penal Code § 1376(b)(2); Conn. Gen. St. § 53a-46a(h); Ga.Code Ann. § 17-7-131(c)(3); La.Code Crim. Proc. Art. 905.5.1(c)(1); Mo. Rev. St. § 565.030.4(1), (4); N.C. Gen. St. Ann. § 15A-2005(e); Va.Code Ann. § 19.2-264.3:1.1(C). See also Murphy v. State, 54 P.3d 556, 558 (Okla.Crim.App.2002), modified in part, State ex rel Lane v. Bass, 87 P.3d 629 (Okla.Crim.App.2004); Richardson v. State, 89 Md.App. 259, 598 A.2d 1, 3-4 (1991), aff'd, 332 Md. 94, 630 A.2d 238 (1993) (construing Md.Code Ann., Crim. Law § 20292(b), which does not designate the factfinder); Franklin v. Maynard, 356 S.C. 276, 588 S.E.2d 604, 606 (2003).
[22] In New Jersey, a result similar to that in Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (a case in which the Court upheld a death sentence imposed by a trial judge after the jury had recommended life imprisonment) could not occur. The issue of its continued viability thus does not presently arise. Similarly, see Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (upholding statutory scheme that permitted a judge to impose a death sentence after "considering" advisory jury verdict without specification of weight to be accorded to the jury's recommendation).
[23] The defense notes other instances when, if the issue is raised, the State is required to negate the existence of a claimed mental condition. See, e.g., duress, N.J.S.A. 2C:2-9; consent, N.J.S.A. 2C:2-10; the defense of self, property and others, N.J.S.A. 2C:3-4 to -8; and passion/provocation, N.J.S.A. 2C:11-4.
[24] We are particularly concerned by the imposition of a clear and convincing burden of proof on a defendant in a capital cause. See Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (holding that Oklahoma's requirement that a defendant prove his incompetency by clear and convincing evidence violated due process).
[1] It has been reported that thirty-nine convicts have been executed in Georgia since 1976. See http://www.deathpena ltyinfo.org/state (last visited August 2, 2005). Only five states have executed more: Texas (346), Virginia (94), Oklahoma (78), Missouri (64), and Florida (60). Ibid.
[2] In 1972, the Court held that the death penalty was not unconstitutional per se but had to be reformed before it could be constitutionally administered. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The moratorium on the use of the death penalty then imposed was lifted four years later in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
[3] Since lifting the death penalty moratorium in 1976, the Supreme Court has found other constitutional limitations in its application. See, e.g., Roper v. Simmons, ___ U.S. ___, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (the Eighth Amendment prohibits execution of defendants who are sixteen or seventeen years of age); Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (the Eighth Amendment prohibits executions of defendants younger than sixteen years of age); Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (the Eighth Amendment prohibits execution of defendants who are insane). The door also remains open to further limitations because the "basic concept underlying the Eighth Amendment is nothing less than the dignity of man [and] draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 100-01, 78 S.Ct. 590, 597-98, 2 L.Ed.2d 630, 642 (1958); State v. Ramseur, 106 N.J. 123, 171, 524 A.2d 188 (1987). So long as the scope of the Eighth Amendment is fixed to evolving standards of decency, the extent to which it permits the use of the death penalty can be expected to further shrink if not wither away altogether.
[4] Our task in this matter has been, in essence, to surgically repair N.J.S.A. 2C:11-3c in light of the fact that it has remained unchanged since Atkins. Accord State v. Natale, 184 N.J. 458, 485-86, 878 A.2d 724 (2005) (Natale II). Because N.J.S.A. 2C:11-3c does not expressly exclude mentally retarded defendants from the class of persons eligible for a death sentence, the statute is broader in scope than permitted by the Eighth Amendment. As a result, in the words of our Supreme Court in Natale II, supra, 184 N.J. at 491-92, 878 A.2d 724, we are obliged to "judicially adjust[]" the capital murder statute so that it conforms with Atkins and with what we perceive the Legislature's approach would have been if it had acted in this regard. See Natale II, supra, 184 N.J. at 485-86, 878 A.2d 724; State v. Franklin, 184 N.J. 516, 539-40, 878 A.2d 757 (2005); State v. Abdullah, 184 N.J. 497, 506-07, 878 A.2d 746 (2005). Guided by the Sixth, Eighth and Fourteenth Amendments, I would conclude that we should interpret the capital murder statute as if N.J.S.A. 2C:11-3c now included a condition that the trial not proceed to a death sentence proceeding unless the State proves the defendant is not mentally retarded. In effect, in my view, to be constitutionally applied, the capital murder statute must be interpreted as if it had been amended to include the emphasized phrase in the following portion of N.J.S.A. 2C:11-3c: "Any person convicted under subsection a.(1) or (2) who is not mentally retarded and who committed the homicidal act by his own conduct. . . ."
[5] See N.J.S.A. 2C:11-3c(2)(a) ("At the [death sentence] proceeding, the State shall have the burden of establishing beyond a reasonable doubt the existence of any aggravating factors set forth in paragraph (4) of this subsection. The defendant shall have the burden of producing evidence of the existence of any mitigating factors set forth in paragraph (5) of this subsection but shall not have a burden with regard to the establishment of a mitigating factor.").
[6] It is hard to imagine a more compelling circumstance for allowing an accused the protections provided by the right to trial by jury, then in the circumstance where the accused is mentally retarded and yet faces the considerable power and resources of the State that seek his death. See McCleskey v. Kemp, 481 U.S. 279, 343, 107 S.Ct. 1756, 1793-94, 95 L.Ed.2d 262, 311 (1987) (Brennan, J., dissenting) ("Those whom we would banish from society or from the human community itself often speak in too faint a voice to be heard above society's demand for punishment.").
[7] In stating his belief that innocent persons had been executed, Justice Blackmun cited, as support, Bedau & Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L.Rev. 21, 36, 173-79 (1987), as well as the Court's refusal in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (to halt the execution of an inmate who claimed his actual innocence of the crime for which he was convicted and sentenced to death).
[8] In October 2004, Congress constructed an additional device for discerning miscarriages by enacting the Innocence Protection Act, which creates post-conviction procedures applicable to both federal and state prosecutions for the examination and preservation of DNA evidence. 18 U.S.C.A. §§ 3600, 3600A. The mere fact that this Act was adopted strongly suggests a congressional belief that miscarriages do occur and that existing procedures are not wholly adequate to rectify them.
[9] In Herrera, ten years after his conviction, a death row inmate provided evidence in his petition for habeas corpus that suggested his actual innocence. In his opinion announcing the Court's judgment that the inmate was not entitled to an evidentiary hearing, Chief Justice Rehnquist only assumed and did not declare that, in a capital case, "a truly persuasive demonstration of `actual innocence' made after trial would render the execution of a defendant unconstitutional" and warrant federal habeas relief. 506 U.S. at 417, 113 S.Ct. at 869, 122 L.Ed.2d at 227. The four justices who joined him (Justices O'Connor, Kennedy, Scalia and Thomas), however, also wrote or joined in concurring opinions that call into question whether a majority of the Court has recognized, in Justice O'Connor's words, that the execution of a "legally and factually innocent person would be a constitutionally intolerable event." Id. at 419, 113 S.Ct. at 870, 122 L.Ed.2d at 228. Justice O'Connor, joined by Justice Kennedy, held that it would be. Ibid. Justice Scalia, joined by Justice Thomas, stated that "[t]here is no basis in text, tradition, or even in contemporary practice (if that were not enough) for finding in the Court a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction." Id. at 427-28, 113 S.Ct. at 874, 122 L.Ed.2d at 234. Justice White wrote separately to say that he assumed that "a persuasive showing of `actual innocence' made after trial [so long as it would demonstrate that no reasonable trier of fact could find proof of guilt beyond a reasonable doubt], even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case." Id. at 429, 113 S.Ct. at 875, 122 L.Ed.2d at 235. Justice Blackmun, joined by Justices Stevens and Souter, stated: "I think it is crystal clear that the execution of an innocent person is `at odds with contemporary standards of fairness and decency.' Indeed, it is at odds with any standard of decency that I can imagine." Id. at 431, 113 S.Ct. at 876, 122 L.Ed.2d at 236.
[10] See Furman, supra, 408 U.S. at 305, 92 S.Ct. at 2760, 33 L.Ed.2d at 387 (Brennan, J., concurring) ("Today death is a uniquely and unusually severe punishment. When examined by the principles applicable under the Cruel and Unusual Punishments Clause, death stands condemned as fatally offensive to human dignity."); id. at 371, 92 S.Ct. at 2794, 33 L.Ed.2d at 424-25 (Marshall, J., concurring) ("In striking down capital punishment, this Court does not malign our system of government. On the contrary, it pays homage to it. Only in a free society could right triumph in difficult times, and could civilization record its magnificent advancement. In recognizing the humanity of our fellow beings, we pay ourselves the highest tribute."); Callins, supra, 510 U.S. at 1145, 114 S.Ct. at 1130, 127 L.Ed.2d at 438 (Blackmun, J., dissenting); State v. Koskovich, 168 N.J. 448, 581, 776 A.2d 144 (2001) (Long, J., concurring in part and dissenting in part) ("We can no longer ignore the fact that the so-called justifications in favor of the death penalty have withered and that a consensus is growing  not only at home, but across the country and around the world  that the death penalty is unfair, unjust and incompatible with present standards of decency."); State v. Brown, 138 N.J. 481, 593, 651 A.2d 19 (1994) (Handler, J., concurring and dissenting) ("We seem determined to seek the ultimate punishment, but we are equally determined not to give up our constitutional protections. Our experience is teaching us that we cannot have boththe retributive luxury of sentencing criminals to death and the constitutional glory of due process and the rule of law.").
[11] See Callins, supra, 510 U.S. at 1143-44, 114 S.Ct. at 1129, 127 L.Ed.2d at 437 (Blackmun, J., dissenting) ("Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, . . . and, despite the efforts of the States and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake.").
[12] Assuming for argument's sake that the federal constitution does not support our judgment, I would conclude that the same result is compelled by art. I, ¶ s 9 and 12 of our state constitution. It would be appropriate to interpret our state constitution expansively in light of the fact that no death row inmates have been executed in New Jersey since the Supreme Court lifted its moratorium nearly thirty years ago. That fact suggests that standards of decency in New Jersey have evolved to a point where executions should not be expected to occur in this State except when the guilt and death eligibility of the defendant have been resolved after only the most exacting examination.