908 A.2d 181

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. PORFIRIO JIMENEZ, DEFENDANT–
RESPONDENT.

Argued November 29, 2005—Decided October 24, 2006.

*John K. McNamara, Jr.,* Assistant Prosecutor, argued the cause for appellant (*Michael M. Rubbinaccio,* Morris County Prosecutor, attorney).

*Joseph E. Krakora,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Krakora* and *Susan Remis Silver,* Special Counsel to the Public Defender, on the letter briefs).

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Peter C. Harvey,* Attorney General, attorney).

*Jeffrey S. Mandel,* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Pitney Hardin,* attorneys).

Chief Justice PORITZ delivered the opinion of the Court.

This case presents an issue of first impression in New Jersey. In *Atkins v. Virginia,* 536 *U.S.* 304, 122 *S.Ct.* 2242, 153 *L.Ed.2d* 335 (2002), the United States Supreme Court held that the execution of a mentally retarded person violates the prohibition against cruel and unusual punishment found in the Eighth Amendment. *Atkins* left to the states the procedures to be followed by the courts when a capital defendant raises a claim of mental retardation. This case requires that we establish such procedures in New Jersey.

## I.

Ten-year-old W.C. of Morristown was reported missing after he failed to return home from a visit to a carnival on May 20, 2001.[1]

---

[1] The facts of this case are set forth in detail in *State v. Jimenez,* 175 *N.J.* 475, 815 *A.2d* 976 (2003) (*Jimenez I*).

When his body was discovered two days later near the Whippany River, it appeared that he had been stabbed multiple times and that his head had been bludgeoned. There was also evidence that he had been sexually assaulted. After an investigation, the police focused on defendant, Porfirio Jimenez, whose DNA matched DNA found on W.C.'s underpants. Jimenez confessed to the crime following his arrest on May 28, 2001.

Defendant's capital trial for the murder and sexual assault of W.C. is now pending in Morris County. By pretrial motion, he has claimed that he is mentally retarded and thus ineligible for the death penalty pursuant to *Atkins*. On July 21, 2004, the trial court directed the parties to submit proposed procedures for adjudicating defendant's *Atkins* claim. Subsequently, in September 2004, defendant sought an order from the court establishing specific procedures by which to assess his claim of mental retardation. In support, defendant provided a report prepared by his forensic psychologist, Dr. Frank Dyer, who administered the Wechsler Adult Intelligence Scale–Revised Test (I.Q. test).[2] He reviewed extensive documentation related to defendant's background, and interviewed defendant. Based on an I.Q. test score of sixty-eight, and on his "significant deficits in a number of areas of adaptive behavior," Dr. Dyer opined that "to a reasonable degree of psychological certainty ... the subject qualifies for a diagnosis of Mental Retardation, Mild" as defined in the *Diagnostic and Statistical Manual of Mental Disorders*, American Psychiatric Association, Fourth Edition Text Revision (2000) (DSM–IV).[3]

---

[2] An assessment tool for measuring intelligence (I.Q.), the Wechsler Adult Intelligence Test (WAIS), consists of fourteen verbal and performance subtests. Alan S. Kaufman & Elizabeth O. Lichtenberger, *Essentials of WAIS–III Assessment* 1, 6, 8 (1999). The raw scores from the subtests are turned into standard scores for purposes of "interpret[ing] an examinee's performance." *Id.* at 60. Of those tested, "two-thirds [score] ... between 85 and 115." *Ibid.*

[3] Both the trial court and the Appellate Division accepted the definition of mental retardation found in the DSM–IV as the standard to be met when an *Atkins* claim is raised. *See State v. Jimenez*, 380 *N.J.Super.* 1, 12–15, 880 *A.2d* 468 (App.Div.2005). That standard has not been challenged by the defendant or

When defendant submitted to psychological testing by Dr. Frank Dattilio, the State's expert, he reported defendant's I.Q. test Full Scale Score as sixty-nine. After document review, additional testing and an interview, Dr. Dattilio concluded that defendant does not meet the criteria "within a reasonable degree of psychological probability, . . . both as per the I.Q. testing, as well as the review of material on adaptive functioning, to warrant a diagnosis of mental retardation."

On March 7, 2005, the trial court issued its decision setting forth the procedure for adjudicating an *Atkins* claim. The court determined that the DSM–IV definition of mental retardation, accepted by both parties, comported with this Court's decision in *State v. Harris*, 181 *N.J.* 391, 859 *A.*2d 364 (2004) (*Harris III*), cert. denied, —— *U.S.* ——, 125 *S.Ct.* 2973, 162 *L.Ed.*2d 898 (2005),[4] and with the United States Supreme Court's decision in *Atkins, supra.* In respect of the proper procedures to be followed, the trial court considered whether the holding in *Blakely v. Washington*, 542 *U.S.* 296, 124 *S.Ct.* 2531, 159 *L.Ed.*2d 403 (2004), that a defendant has the right to have all facts legally essential to the punishment proven to a jury under the Sixth Amendment, is applicable in an

---

the State. Under the DSM–IV definition, mental retardation is evidenced by significantly subaverage general intellectual functioning; an I.Q. of 70 or below on an individually administered I.Q. test; significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and onset before the age of eighteen years. Because the DSM–IV definition recognizes a measurement error of five points in assessing I.Q., persons with I.Q.s between 70 and 75 who exhibit significant deficits in adaptive behavior may be mentally retarded. Moreover, impairments in adaptive functioning, and not low I.Q., are generally the presenting indicators of mental retardation. Persons with mild mental retardation I.Q. levels of 50–55 to approximately 70 represent the largest sub-group (about 85%) of the mentally retarded. *DSM–IV, supra*, at 41–43.

[4] In *Harris III, supra*, we held that defendants have the burden of demonstrating mental retardation through the presentation of evidence in respect of limited intellectual functioning, *e.g.*, standard I.Q. tests, and adaptive deficiencies that have been manifest since childhood. *Id.* at 528–29, 859 *A.*2d 364.

*Atkins* case. The court declined to reach the question, noting that this Court was then considering the application of *Blakely* to New Jersey's criminal code in *State v. Natale,* 184 *N.J.* 458, 878 *A.*2d 724 (*Natale II* ), decided subsequently in 2005. Absent post-*Atkins* legislation, and without "the benefit of [this] Court's view," the trial court established a process for determining in a capital case whether defendant is mentally retarded.

Under the trial court's construct, the judge would hold a pretrial hearing in which the defendant would have the burden of proving his or her mental retardation by a preponderance of the evidence. Explaining that it is the defendant "who seeks to be treated differently from other individuals who are alleged to have committed similar acts," the court placed the initial burden on the defendant. If the defendant demonstrates that "it is more likely than not" he or she is mentally retarded, the trial would proceed as a capital case. "[I]f [the] defendant is found guilty ... a sequential trial [w]ould be conducted by the same jury." Additional evidence could be presented at that proceeding, but "[t]he State would have the burden of disproving mental retardation unanimously beyond a reasonable doubt." If the State fails to meet its burden, the jury's finding on the *Atkins* claim would be considered the equivalent of a final verdict. If the State meets its burden, the defendant would be eligible for the death penalty and the penalty phase would continue, subject to the jury's findings on aggravating and mitigating circumstances. The defendant would be permitted to raise mental "retardation separately as mitigating evidence in the penalty phase."

If at the pretrial hearing, the defendant proves his or her mental retardation claim by clear and convincing evidence, the State would be foreclosed from seeking the death penalty. The trial court imposed this higher standard of proof to justify "depriving the State of an opportunity to present its position to the jury on the retardation issue." If the defendant was unable to meet even the preponderance standard, the issue of mental retardation would be available to the defendant only as a mitigating factor

that could be presented to the jury at the penalty phase on a determination of the court that the evidence of the alleged condition has been adequately and sufficiently raised.

The trial court denied both parties' motions to stay the proceedings. On March 14, 2005, however, the Appellate Division granted a stay on an emergent basis, and, subsequently, granted leave to appeal the trial court's decision. This Court denied the State's motion for direct certification on April 13, 2005.

The Appellate Division, on August 17, 2005, held that the "New Jersey [ ] constitution ... embrace[s] the essential principles of *Apprendi* [*v. N.J.*, 530 *U.S.* 466, 120 *S.Ct.* 2348, 147 *L.Ed.*2d 435 (2000)], *Ring* [*v. Arizona*, 536 *U.S.* 584, 122 *S.Ct.* 2428, 153 *L.Ed.*2d 556 (2002)], *Blakely* and *Booker*[*v. U.S.*, 543 *U.S.* 220, 125 *S.Ct.* 738, 160 *L.Ed.*2d 621 (2005)], and ... require[s] their application in th[e] *Atkins* context." *Jimenez*, 380 *N.J.Super.* 1, 26, 880 *A.*2d 468 (App.Div.2005). Those principles require that facts necessary to the imposition of a sentence above the statutory maximum, other than a prior conviction, must be found by a jury beyond a reasonable doubt unless admitted by the defendant. *Id.* at 18–21, 880 *A.*2d 468. In other words, such facts are, under the cited cases, deemed to be the functional equivalent of an element of the offense.

The panel also found significant this Court's description "of New Jersey's capital murder statute as accretive in nature." *Id.* at 22, 880 *A.*2d 468 (discussing *State v. Fortin*, 178 *N.J.* 540, 634–36, 843 *A.*2d 974 (2004) (*Fortin II*)). Extrapolating from the *Fortin II* formulation—that life imprisonment is the maximum penalty available under New Jersey's capital murder statute absent further findings by the jury of a capital trigger and aggravating factors—the panel determined that New Jersey's capital sentencing scheme reinforces the conclusion derived from the *Apprendi* line of cases. The panel reasoned that when a defendant with a colorable claim of mental retardation is found *not* retarded, that finding is tantamount to a sentencing enhancer. Therefore, the State is required to prove beyond a reasonable doubt to a jury that the defendant is

not retarded. *Jimenez, supra*, 380 *N.J.Super.* at 22–28, 880 *A.*2d 468. The Appellate Division observed that "placing the burden upon the State ... is consistent with the State's treatment of diminished capacity[,]" which is considered by a jury " 'in relation to the State's burden to prove the essential elements of the crime.' " *Id.* at 31, 880 *A.*2d 468 (quoting *State v. Delibero*, 149 *N.J.* 90, 98, 692 *A.*2d 981 (1997)).

In respect of the procedures for adjudicating the *Atkins* issue, the Appellate Division stated:

> In summary, we reverse the order of the trial court as it relates to pre-trial procedures designed to resolve the issue of whether Jimenez is mentally retarded, finding that a judge can make that decision pre-trial only in those rare occasions in which reasonable minds cannot differ as to the existence of retardation. We affirm his order as it relates to proceedings after the guilt phase, finding on state constitutional and policy grounds that when the issue of retardation has been properly raised, the lack of retardation functions in a manner similar to a triggering factor to be determined by a jury in the second, post-guilt, phase of a capital prosecution, with the State bearing the burden of proof beyond a reasonable doubt. Even if the defendant is found by a jury not to be mentally retarded, evidence of his mental status can be introduced as a mitigating factor.
>
> [*Jimenez, supra*, 380 *N.J.Super.* at 34, 880 *A.*2d 468.]

In a concurring opinion, Judge Fisher suggested that the result reached by the majority was compelled not only under New Jersey law, but by the federal constitution. *Id.* at 45–46, 880 *A.*2d 468.

We granted the State's motion for leave to appeal on October 5, 2005. *State v. Jimenez*, 185 *N.J.* 286, 884 *A.*2d 1259 (2005). We also granted *amicus curiae* status to the Attorney General of New Jersey and the Association of Criminal Defense Lawyers of New Jersey.

## II.

*Atkins, supra*, is about the values that give meaning to the Eighth Amendment and the application of those values to the imposition of the death penalty in this country. 536 *U.S.* at 306–07, 122 *S.Ct.* at 2244, 153 *L.Ed.*2d at 341. As Justice Stevens explains:

"The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."
[*Id.* at 311–12, 122 *S.Ct.* at 2247, 153 *L.Ed.*2d at 344 (*quoting Trop v. Dulles,* 356 *U.S.* 86, 100–01, 78 *S.Ct.* 590, 597–98, 2 *L.Ed.*2d 630, 642 (1958)).]

Through that prism, the Court determined that " 'objective evidence of contemporary values[,]' " tempered by the Court's own judgment, prevented as excessively punitive the execution of mentally retarded persons. *Atkins, supra,* 536 *U.S.* at 312–13, 321, 122 *S.Ct.* at 2247–48, 2252, 153 *L.Ed.*2d at 344–45, 350 (quoting *Penry v. Lynaugh,* 492 *U.S.* 302, 331, 109 *S.Ct.* 2934, 2953, 106 *L.Ed.*2d 256, 286 (1989)). In so deciding, the Supreme Court overruled its prior decision in *Penry, supra,* 492 *U.S.* at 340, 109 *S.Ct.* at 2958, 106 *L.Ed.*2d at 292, which had held that a national consensus against executing the mentally retarded had not yet emerged.

Daryl Renard Atkins was convicted of the 1996 abduction, armed robbery, and capital murder of Eric Nesbitt. In the penalty phase of his trial, defendant presented one witness, a forensic psychologist who had evaluated Atkins before trial and who testified that Atkins had a Full Scale I.Q. of 59 and was " 'mildly mentally retarded.' " *Atkins, supra,* 536 *U.S.* at 308–09, 122 *S.Ct.* at 2245, 153 *L.Ed.*2d at 342. The jury returned a death sentence that was overturned by the Virginia Supreme Court for reasons unrelated to the question of mental retardation. At the second penalty-phase hearing, the defense again presented the testimony of its forensic psychologist. The State, in turn, offered an expert rebuttal witness who testified that Atkins was of " 'average intelligence, at least,' " and was not mentally retarded. The jury sentenced defendant to death a second time, and the Supreme Court of Virginia affirmed. *Id.* at 307–10, 122 *S.Ct.* at 2244–46, 153 *L.Ed.*2d at 341–43.

In reaching its decision in *Atkins,* the United States Supreme Court noted that, since *Penry,* a growing number of states had passed legislation banning the execution of the mentally retarded, and that the death penalty had been rarely used during that

period for offenders with a known I.Q. below seventy. *Id.* at 314–16, 122 *S.Ct.* at 2248–49, 153 *L.Ed.*2d at 346–47. The Court found additional support for a new understanding of the issue from the "official positions" of "organizations with germane expertise," "representatives of widely diverse religious communities," the international community, and national polling data, *id.* at 316 n. 21, 122 *S.Ct.* at 2249 n. 21, 153 *L.Ed.*2d at 347 n. 21, and determined that a country-wide consensus had emerged since *Penry* against the imposition of capital punishment on the mentally retarded. *Id.* at 316, 122 *S.Ct.* at 2249, 153 *L.Ed.*2d at 347.

In the Court's view, that broad consensus reflected a "judgment about the relative culpability of mentally retarded offenders, . . . the relationship between mental retardation and the penological purposes served by the death penalty[,]" and the efficacy of procedural protections when a mentally retarded defendant's life is at stake. *Id.* at 317–21, 122 *S.Ct.* at 2250–52, 153 *L.Ed.*2d at 348–50. The Court pointed out that

> [m]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.
>
> [*Id.* at 318, 122 *S.Ct.* at 2250–51, 153 *L.Ed.*2d at 348 (footnotes omitted).]

Because of those factors, the Court found that neither the justification of retribution nor the justification of deterrence is applicable to mentally retarded defendants. Because those defendants are not likely to be fully capable of assisting counsel in their defense, of providing convincing testimony, or of showing remorse before a jury, they "face a special risk of wrongful execution." *Id.* at 321, 122 *S.Ct.* at 2252, 153 *L.Ed.*2d at 350. The Court concluded "that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Ibid.* (quoting *Ford v. Wainwright,* 477 *U.S.* 399, 405, 106 *S.Ct.* 2595, 2599, 91 *L.Ed.*2d 335, 343 (1986)).

As in *Ford, supra,* in respect of the insanity defense, the Atkins Court declined to establish minimum standards to guide the states, but rather, anticipated that the states would " 'develop[ ] appropriate ways to enforce the constitutional restriction.' " [5] *Atkins, supra,* 536 *U.S.* at 317, 122 *S.Ct.* at 2250, 153 *L.Ed.*2d at 348 (quoting *Ford, supra,* 477 *U.S.* at 416–17, 106 *S.Ct.* at 2605, 91 *L.Ed.*2d at 351). *See Schriro v. Smith,* 546 *U.S.* 6, 126 *S.Ct.* 7, 163 *L.Ed.*2d 6 (2005) (reaffirming *Atkins*).

### III.

After *Atkins,* many of our sister states implemented procedures for determining whether a capital defendant is mentally retarded, and therefore, ineligible for execution. In a number of states the courts have issued opinions or promulgated court rules allocating the burden of proof and establishing a process for decision-making, *see, e.g., Ex parte Briseno,* 135 *S.W.*3d 1 (Tex.Crim.App. 2004); *Amendments to Florida Rules of Criminal Procedure and Florida Rules of Appellate Procedure,* 875 *So.*2d 563 (Fla.2004). However, in most jurisdictions, the State Legislature has enacted statutes implementing *Atkins. See, e.g., Ark.Code Ann.* § 5–4–618 (2006).

Every state that has addressed the issue has found that the defendant should bear the burden of proof on an *Atkins* claim, and all but six require the defendant to prove mental retardation by a preponderance of the evidence.[6] *See Pruitt v. State,* 834 *N.E.*2d 90, 102 n. 1 (Ind.2005) (listing states that use preponderance of evidence standard), *cert. denied,* —— *U.S.* ——, 126 *S.Ct.* 2936, 165

---

[5] *Atkins, supra,* left to the individual states the task of defining mental retardation, although it specifically noted formulations adopted by the American Association of Mental Retardation and the American Psychiatric Association. 536 *U.S.* at 308 n. 3, 317 n. 22, 122 *S.Ct.* at 2245 n. 3, 2250 n. 22, 153 *L.Ed.*2d at 342 n. 3, 348 n. 22.

[6] Several states have not addressed the burden of proof issue. *See Pruitt v. State,* 834 *N.E.*2d 90, 102 n. 1 (Ind.2005) (listing states that have not established burden of proof); *Ex parte Briseno, supra,* 135 *S.W.*3d at 12 n. 44 (same).

*L.Ed.*2d 962 (2006); *Ex parte Briseno, supra,* 135 *S.W.*3d at 12 n. 44 (same). By way of example, the Indiana Supreme Court rejected the imposition of a higher burden of proof on the defendant, explaining that a clear and convincing standard "would result in execution of some persons who are mentally retarded" and that "the defendant's right not to be executed if mentally retarded outweighs the state's interest" in imposing the death penalty. *Pruitt, supra,* 834 *N.E.*2d at 103. In this respect, the court expressed a concern that mentally retarded defendants face a heightened risk of wrongful execution because of their diminished ability to assist in their own defense. *Id.* at 102–03. On the other hand, five states use the clear and convincing evidence standard, *see id.* at 102 n. 1 (listing states that use clear and convincing standard); *Ex parte Briseno, supra,* 135 *S.W.*3d at 12 n. 44 (same), and one state—Georgia—mandates that a defendant prove his or her mental retardation beyond a reasonable doubt. *Head v. Stripling,* 277 *Ga.* 403, 590 *S.E.*2d 122, 128 (2003).

States also vary in the timing of the *Atkins* determination in relation to the defendant's criminal trial. Most states have implemented pretrial hearings at least in part because an early decision "spares both the State and the defendant the onerous burden of a futile bifurcated capital sentencing procedure." *State v. Williams,* 831 *So.*2d 835, 860 (La.2002). Yet other states have opted for a determination after the guilt-phase trial but before sentencing, *see, e.g., Kan. Stat. Ann.* § 21–4623 (2005), and others adjudicate the *Atkins* claim as part of the sentencing phase trial, *see, e.g., Wash. Rev.Code Ann.* § 10.95.030(2)(2006). In most jurisdictions, a judge serves as the factfinder on the mental retardation question, whereas in a minority of jurisdictions the *Atkins* determination is left to the jury. *See Ex parte Briseno, supra,* 135 *S.W.*3d at 10.

Finally, because there is no universally accepted definition for mental retardation, states have adopted different standards, although all generally share some form of the three primary elements of mental retardation: intelligence level (based on testing),

functional limitations, and age of onset. *See* Cynthia A. Orpen, *Following in the Footsteps of Ford: Mental Retardation and Capital Punishment Post–Atkins,* 65 *U. Pitt. L. Rev.* 83, 91–95 (2003).

In this case, we must establish *Atkins* procedures for New Jersey.

## IV.

On appeal to this Court, the State argues that a defendant should bear the burden of proving his or her mental retardation by a preponderance of the evidence. The State contends that the absence of mental retardation is not an element of the offense of capital murder and that a defendant raising an *Atkins* claim has no Sixth Amendment right to a jury trial on the issue. For those reasons, a claim of mental retardation should be presented to and decided by a judge in a pretrial hearing. Even if the defendant is entitled to have a jury hear the issue, the State argues that the defendant should bear the burden of persuasion, as in cases in which a defendant asserts an insanity defense. The State asserts that if the defendant fails to meet his or her burden on the *Atkins* claim, the issue of mental retardation can be raised during the penalty phase of the trial as mitigation.

The defendant argues that he has a Sixth Amendment right to have a jury decide the *Atkins* claim and that a hearing on the claim should take place after the guilt phase of the trial. He asks this Court to affirm the determination of the Appellate Division and to hold that the State should bear the burden of proving beyond a reasonable doubt that he is not mentally retarded.

## A.

In *Fortin II, supra,* this Court described the three separate components of a capital prosecution.

First, the State must prove beyond a reasonable doubt that the defendant purposefully or knowingly caused death or serious bodily injury resulting in death. *N.J.S.A.* 2C:11–3a(1), (2). Second, the State must prove beyond a reasonable doubt

one of the capital "triggers" in order to advance the defendant to the penalty-phase trial. . . . Third, in the penalty-phase trial, the State must prove beyond a reasonable doubt the existence of any alleged statutory aggravating factors. *N.J.S.A.* 2C:11–3c(2)(a). If the jury finds one or more aggravating factors, it must then determine whether those outweigh all of the mitigating factors beyond a reasonable doubt. *N.J.S.A.* 2C:11–3c(3)(a).

[*Id.* at 634–35, 843 *A.*2d 974.]

The Appellate Division found that the absence of retardation constitutes the functional equivalent of a capital trigger, and that the State therefore must prove to a jury beyond a reasonable doubt that a defendant is not retarded. *Jimenez, supra,* 380 *N.J.Super.* at 26, 880 *A.*2d 468. The panel reasoned that unless the State is able to prove the absence of retardation, the death penalty is not available—in other words, the death penalty is, in that circumstance, a sentence above the maximum. As with other sentencing enhancers, the absence of retardation must be found by a jury. *Id.* at 27, 880 *A.*2d 468; *see Blakely, supra,* 542 *U.S.* at 301, 124 *S.Ct.* at 2536, 159 *L.Ed.*2d at 412 (explaining that facts raising penalty beyond statutory maximum must be proved to jury "beyond a reasonable doubt"); *Natale, supra,* 184 *N.J.* at 473, 878 *A.*2d 724 (same).

In reversing the Appellate Division on the issue of the burden of proof, we find that the absence of mental retardation is not akin to a capital trigger, and that the defendant has the burden to prove by a preponderance of the evidence that he is retarded. The State argues, and the Appellate Division agrees, that "the potential for the imposition of a death penalty inheres within the statute . . . and to that extent death constitutes the statutory 'maximum' provided by *N.J.S.A.* 2C:11–3c." *Jimenez, supra,* 380 *N.J.Super.* at 22, 880 *A.*2d 468. *Fortin II* did not suggest otherwise; rather, *Fortin II* described a capital murder trial as having three components, each requiring factual findings that ultimately permit the imposition of the maximum penalty—a sentence of death. *See Fortin II, supra,* 178 *N.J.* at 634–36, 843 *A.*2d 974. Simply put, defendant's claim of mental retardation does not enhance the penalty he faces. If he is found to be mentally retarded, his maximum sentence is thereby limited to a

term of imprisonment.[7] In some sense, the finding of mental retardation is like a dispositive mitigating factor. Although mildly retarded defendants may have the capacity to stand trial, they are not able to assist in their defense as effectively as other defendants and may give the impression, inaccurately, that they lack remorse. They are, for those reasons, at a disadvantage in a capital prosecution. *Atkins, supra,* 536 *U.S.* at 320–21, 122 *S.Ct.* at 2252, 153 *L.Ed.*2d at 350. Once mental retardation is found, the death penalty is no longer available, suggesting that mental retardation is analogous to a conclusive mitigating factor in New Jersey's capital murder scheme.

A claim of mental retardation is also in many respects akin to a claim of insanity. Insanity is an affirmative defense which a defendant must prove. *See N.J.S.A.* 2C:4–1; *Delibero, supra,* 149 *N.J.* at 99, 692 *A.*2d 981. This burden is properly placed on defendants because the claim is unrelated to the underlying elements of the crime that the State must prove beyond a reasonable doubt in every case. *See Patterson v. New York,* 432 *U.S.* 197, 210, 97 *S.Ct.* 2319, 2327, 53 *L.Ed.*2d 281, 292 (1977) (holding that "proof of the non-existence of all affirmative defenses has never been constitutionally required" and declining to apply

---

[7] The dissent asserts that a defendant found guilty of murder in his or her guilt-phase trial "cannot receive a sentence greater than life" unless additional facts are found. *Post* at 411, 908 *A.*2d at 193. As far as it goes, that assertion is correct—but it is irrelevant. *State v. Abdullah,* 184 *N.J.* 497, 507, 878 *A.*2d 746 (2005), explains that New Jersey's Criminal Code does not establish a presumptive term for murder. The defendant in *Abdullah* objected to the imposition by a judge of a life sentence without fact finding by a jury, alleging that under *N.J.S.A.* 2C:11–3b(1) thirty years served as a presumptive sentence. *Ibid.* However, as the Court pointed out, the statute states that " 'except as provided in subsection c of this section' " (the death penalty provision), the term for persons convicted of murder " 'shall be between 30 years and life imprisonment,' " and held that thirty years is not a presumptive sentence, but rather, the lower end of the range. *Id.* at 507–08, 878 *A.*2d 746. Subsection c extends the possible maximum based on capital triggers found beyond a reasonable doubt, *see N.J.S.A.* 2C:11–3c; a determination of mental retardation reduces the maximum to life in prison even when capital triggers or aggravating factors are found. Due process concerns are not implicated in such cases.

such rule to defense of extreme emotional distress under New York law); *Leland v. Oregon*, 343 *U.S.* 790, 799, 72 *S.Ct.* 1002, 1008, 96 *L.Ed.* 1302, 1309 (1952) (finding that "the issue of insanity as an absolute bar to the charge" may be placed on defendant). If the State successfully meets its burden but a jury finds a defendant not guilty by reason of insanity, the defendant is not "set free[,]" but is "subject to further commitment proceedings." *Delibero, supra,* 149 *N.J.* at 105, 692 *A.*2d 981. In a case of mental retardation, the State also must prove all of the elements of the crime of capital murder, including a capital trigger, but if the defendant proves mental retardation, the punishment is reduced.

The Appellate Division, in holding that the State bears the burden of proving mental retardation, found that a mental retardation claim was more like a diminished capacity claim than a claim of insanity. *Jimenez, supra,* 380 *N.J.Super.* at 31, 880 *A.*2d 468. Diminished capacity, however, refers to a mental disease or defect that may negate the mental state necessary for commission of a crime. *Delibero, supra,* 149 *N.J.* at 92, 692 *A.*2d 981. In other words, a defendant claiming diminished capacity argues that the State cannot prove the mens rea element of the crime beyond a reasonable doubt because he or she lacked the capacity to form the requisite intent to commit the crime. *See N.J.S.A.* 2C:4–2 (mental disease or defect may negate required mental state).

In contrast, "[t]he insanity defense exculpates an actor from guilt for conduct that would otherwise be criminal." *Delibero, supra,* 149 *N.J.* at 93, 692 *A.*2d 981. A defendant claiming insanity does not argue that he or she did not engage in a criminal act with the requisite mental state, but argues instead that he or she did not "know the nature and quality of the act" committed or "did not know what he [or she] was doing was wrong." *N.J.S.A.* 2C:4–1. "An insane person, unlike one suffering from diminished capacity, may act in accordance with the elements required to commit an offense, but the insanity absolves that person of criminal responsibility." *Delibero, supra,* 149 *N.J.* at 99, 692 *A.*2d 981. Here also, all of the elements of the crime may be proven

beyond a reasonable doubt by the State, but the finding of mental retardation reduces the defendant's responsibility and he cannot be sentenced to the maximum penalty.

 We find that an *Atkins* claim does not negate an element of the crime or constitute a capital trigger under New Jersey's capital murder statute. *N.J.S.A.* 2C:11–3c.

## B.

 As noted above, every state considering the issue has determined that a defendant raising a claim of mental retardation bears the burden of proof on the claim. We agree with those determinations. We hold further that the claim must be proved to the jury by a preponderance of the evidence at the close of the guilt-phase trial and before the penalty-phase trial begins. Nonetheless, we concur with the Appellate Division that in those cases where "reasonable minds cannot differ as to the existence of retardation" a judge should decide the *Atkins* claim pre-trial thus avoiding a capital prosecution altogether. *Jimenez, supra,* 380 *N.J.Super.* at 34, 880 *A.*2d 468. The requirement that a jury decide the issue at the close of the guilt-phase trial is not constitutionally based, but rather, is imposed by the Court in the exercise of its general supervisory authority over trial administration. *See State v. Cook,* 179 *N.J.* 533, 561, 847 *A.*2d 530 (2004) ("The judiciary bears the 'responsibility to guarantee the proper administration of justice ... and, particularly, the administration of criminal justice.'" (quoting *State v. Williams,* 93 *N.J.* 39, 62, 459 *A.*2d 641 (1983))).

 Under the three-tiered framework described in *Fortin II,* the jury first considers whether the defendant is guilty of capital murder beyond a reasonable doubt. The defendant may raise the issue of mental retardation during the guilt phase of the trial to negate an element of the crime, for example, to demonstrate the absence of intent to "purposely cause[ ] death or serious bodily injury resulting in death." *N.J.S.A.* 2C:11–3a. If the jury

decides that the defendant is guilty, despite any defenses he or she may raise, it then considers whether a statutory capital trigger exists beyond a reasonable doubt. If the answer is no, the defendant is sentenced to a term of imprisonment. If the answer is yes, the defendant will have an opportunity to demonstrate to the jury, by a preponderance of the evidence, that he or she is mentally retarded. If the jury finds that the defendant has met his or her burden, in this instance also, the defendant will be sentenced to a term of imprisonment. If the defendant does not meet his or her burden, a penalty-phase trial will be held and the jury must determine whether the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. The defendant may at that point again present evidence of mental retardation as mitigation weighing against the death penalty.

In sum, defendant may have as many as four opportunities to present a mental retardation defense: at pretrial before the trial court; before a jury during the guilt phase trial; at a separate hearing before a jury after the guilt phase trial; and, finally, before a jury at the penalty-phase trial as mitigation.

## V.

For the reasons expressed herein, the judgment of the Appellate Division is reversed. We refer to the Trial Judges Committee on Capital Causes the task of developing rule recommendations implementing our decision today. In the interim, the trial courts should follow the general procedures set forth herein.

Justice ALBIN, dissenting.

The Eighth Amendment of the United States Constitution forbids the State from executing a criminal defendant who is mentally retarded. *Atkins v. Virginia*, 536 *U.S.* 304, 321, 122 *S.Ct.* 2242, 2252, 153 *L.Ed.*2d 335, 350 (2002). In *Atkins, supra,* the United States Supreme Court left "to the States the task of developing ways to enforce the constitutional restriction" against executing mentally retarded defendants. *Id.* at 317, 122 *S.Ct.* at 2250, 153

*L.Ed.*2d at 348. Relying on recent developments in federal and state constitutional sentencing jurisprudence, as well as notions of fundamental fairness, the Appellate Division concluded that when mental retardation is at issue, the State should bear the burden of proving a capital defendant's lack of mental retardation beyond a reasonable doubt as a precondition to carrying out an execution. *State v. Jimenez,* 380 *N.J.Super.* 1, 26, 880 *A.*2d 468 (App.Div. 2005) (basing decision on State Constitution); *see also id.* at 37, 880 *A.*2d 468 (Fisher, J., concurring) (basing decision on Federal Constitution). In reversing the Appellate Division, the majority has placed on the defendant the burden of proving by a preponderance of evidence his mental retardation. *Ante* at 405, 908 *A.*2d at 190. By shifting the burden of proof to the defendant, the majority unnecessarily, and in my opinion unconstitutionally, increases the likelihood of wrongly executing a mentally retarded person. Because that is a level of error that our system of justice should not be willing to tolerate, I respectfully dissent.

Our judicial system demands a high degree of confidence in a correct outcome in a criminal case because the stakes are enormous—the potential loss of freedom. For that reason, even in a run-of-the-mill criminal case, the most rigorous standard of proof applies, requiring the State to bear the burden of proving guilt beyond a reasonable doubt. That standard recognizes an unwillingness to tolerate a wide margin of error when a person's liberty hangs in the balance. That standard accepts that it is better to err and let a guilty person go free, than to wrongly incarcerate an innocent person. In a capital case, the stakes are considerably higher than in the typical criminal case. Life itself hangs in the balance. *See State v. Feaster,* 184 *N.J.* 235, 249, 877 *A.*2d 229 (2005) ("Not only the defendant, but the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty." (citation and internal quotation marks omitted)). It therefore stands to reason that the finding of any fact that is a necessary precondition to the execution of a criminal defendant, including lack of mental retardation, should likewise be proven by the State beyond a reasonable doubt.

That conclusion is compelled by our federal and state constitutional sentencing jurisprudence. Because the Eighth Amendment prohibits the execution of a mentally retarded person, a finding of lack of mental retardation is a fact that must be submitted to a jury and proven by the State beyond a reasonable doubt before a death sentence can be imposed. The majority's construct requires that the mental retardation claim must be submitted to the jury after a defendant is found guilty of murder in the guilt phase portion of a capital trial. *Ante* at 408, 908 *A.2d* at 191. At that stage, without any further factual finding, the defendant cannot receive a sentence greater than life. *N.J.S.A.* 2C:11–3b, c; *State v. Fortin,* 178 *N.J.* 540, 843 *A.2d* 974 (2004) (*Fortin II*). Instead of requiring the State to carry the burden of proving lack of mental retardation, the majority permits the defendant to be subject to execution if he fails to prove by a preponderance of evidence his mental retardation. *Ante* at 409, 908 *A.2d* at 192. That standard cannot be squared with federal or state case law. *See Apprendi v. New Jersey,* 530 *U.S.* 466, 490, 120 *S.Ct.* 2348, 2362–63, 147 *L.Ed.2d* 435, 455 (2000); *State v. Natale,* 184 *N.J.* 458, 466, 878 *A.2d* 724 (2005).

The Federal Due Process Clause requires that the State bear "the burden of proving all elements" of an offense beyond a reasonable doubt. *Sullivan v. Louisiana,* 508 *U.S.* 275, 277–78, 113 *S.Ct.* 2078, 2080, 124 *L.Ed.2d* 182, 188 (1993). Once an element of an offense has been identified, it is never permissible to shift the burden of proof to the defendant. *See Mullaney v. Wilbur,* 421 *U.S.* 684, 699–702, 95 *S.Ct.* 1881, 1890–91, 44 *L.Ed.2d* 508, 520–22 (1975). In *Apprendi,* the United States Supreme Court declared: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi, supra,* 530 *U.S.* at 490, 120 *S.Ct.* at 2362–63, 147 *L.Ed.2d* at 455. In refining that formulation, the Court in *Blakely v. Washington* explained that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts

reflected in the jury verdict or admitted by the defendant." 542 *U.S.* 296, 303, 124 *S.Ct.* 2531, 2537, 159 *L.Ed.*2d 403, 413 (2004) (emphasis omitted).

In *Ring v. Arizona*, the Court applied the *Apprendi* test in striking down provisions of Arizona's capital sentencing scheme that allowed a judge to impose the death penalty based solely on a judicial finding of aggravating circumstances. 536 *U.S.* 584, 588–89, 122 *S.Ct.* 2428, 2432, 153 *L.Ed.*2d 556, 563–64 (2002). In that case, the defendant was convicted by a jury of first-degree felony murder. *Id.* at 591–92, 122 *S.Ct.* at 2433–34, 153 *L.Ed.*2d at 565. In the absence of any additional judicial factfinding, the maximum allowable sentence under Arizona law was life imprisonment. *Id.* at 582, 122 *S.Ct.* at 2434, 153 *L.Ed.*2d at 566. Defendant was sentenced to death based on a judicial finding of aggravating circumstances. *Id.* at 594–95, 122 *S.Ct.* at 2435–36, 153 *L.Ed.*2d at 567–68. "Because Arizona's enumerated aggravating factors operate[d] as the functional equivalent of an element of a greater offense," increasing a sentence of life to death, the Court found that the Sixth Amendment required that those factors be submitted to a jury, which under the *Apprendi* formulation also requires that all elements be proven by the State beyond a reasonable doubt. *Id.* at 609, 122 *S.Ct.* at 2443, 153 *L.Ed.*2d at 576–77 (internal quotation marks omitted); *Apprendi, supra,* 530 *U.S.* at 490, 120 *S.Ct.* at 2362–63, 147 *L.Ed.*2d at 455; *Natale, supra,* 184 *N.J.* at 473, 878 *A.*2d 724; *see also In re Winship,* 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1073, 25 *L.Ed.*2d 368, 375 (1970) (holding that under Due Process Clause, State must prove all elements of crime beyond reasonable doubt).

As with the aggravating factors in *Ring*, the finding of lack of mental retardation is the functional equivalent of an element of an offense because without that factfinding a sentence of life imprisonment cannot be increased to death. *N.J.S.A.* 2C:11–3b, c; *Fortin II, supra,* 178 *N.J.* at 635–36, 843 *A.*2d 974. Before the death penalty can be imposed in New Jersey, "the State must prove beyond a reasonable doubt the existence of any alleged

statutory aggravating factors" in the penalty-phase trial. *Fortin II, supra,* 178 *N.J.* at 635, 843 *A.*2d 974 (citing *N.J.S.A.* 2C:11–3c(2)(a)). "If the jury finds one or more aggravating factors, it must then determine whether those outweigh all of the mitigating factors beyond a reasonable doubt." *Ibid.* (citing *N.J.S.A.* 3C:11–3c(3)(a)). Without those findings, "life imprisonment is the maximum allowable sentence under the capital-murder statute." *Id.* at 636, 843 *A.*2d 974.

The absence of mental retardation functions in a way similar to an aggravating factor in our capital sentencing system. Lack of mental retardation, like an aggravating factor, is a fact necessary to increase a sentence beyond life imprisonment, the maximum sentence authorized by a murder conviction in the guilt phase of the trial. Because information regarding mental retardation may be in the exclusive control of the defendant, I would place on him the initial burden of production of evidence to raise the issue. Once the defendant raises the issue, however, the State should be required to prove the absence of mental retardation beyond a reasonable doubt. *Cf. State v. Kelly,* 97 *N.J.* 178, 200, 478 *A.*2d 364 (1984) (requiring that once issue of self-defense is adduced in State or defendant's case, State is required to prove absence of self-defense beyond reasonable doubt). Without a beyond-a-reasonable-doubt finding by a jury, a defendant should not be subject to the death penalty. Stated differently, a reasonable doubt about a defendant's mental retardation must weigh in favor of life.

Unlike the majority, I do not believe that this State's *statutory* insanity defense is the proper paradigm for allocating the burden of proof when lack of mental retardation is a *constitutional* prerequisite for the execution of a criminal defendant. *See ante* at 406–408, 908 *A.*2d at 191. To say that the defendant bears the burden of proving insanity as a defense at trial pursuant to *N.J.S.A.* 2C:4–1 is quite different from saying that the State can execute an insane person if a jury has a reasonable doubt about his insanity. In *Ford·v. Wainwright,* 477 *U.S.* 399, 409–10, 106 *S.Ct.* 2595, 2602, 91 *L.Ed.*2d 335, 346 (1986), the United States

Supreme Court declared that insane defendants could not be executed under the Eighth Amendment. There too the Court left it to the States to develop ways to implement its decision. *Id.* at 416–17, 106 *S.Ct.* at 2605, 91 *L.Ed.*2d at 351. In my view, because neither an insane nor mentally retarded defendant can be executed under *Ford, supra,* and *Atkins, supra,* when the issue is properly raised, the State must carry the burden of disproving beyond a reasonable doubt the existence of those disabling conditions of the mind.

Even if I were persuaded that the beyond-a-reasonable-doubt standard was not constitutionally compelled, I would maintain that this Court should mandate that standard pursuant to the Court's general supervisory authority over trial administration. *See State v. Cook,* 179 *N.J.* 533, 539, 847 *A.*2d 530 (2004). This Court should take every reasonable precaution to minimize the potential of wrongly executing a mentally retarded defendant. The majority's approach today is not in keeping with the rigorous procedural protections that should apply in capital cases. *See Feaster, supra,* 184 *N.J.* at 250, 877 *A.*2d 229 ("We are mindful that a death sentence is profoundly different from all other penalties, and of the heightened need for reliability in the determination that death is the appropriate punishment in a specific case." (citations and internal quotation marks omitted)).

In conclusion, I agree with the Appellate Division that when a defendant adequately raises the issue of mental retardation, our federal and state constitutional jurisprudence require that the State bear the burden of proving beyond a reasonable doubt to a jury that the defendant is not mentally retarded. *See Jimenez, supra,* 380 *N.J.Super.* at 26, 37, 880 *A.*2d 468. Because I believe that the majority has unconstitutionally shifted the burden of proof to the defendant, therefore increasing the likelihood of an erroneous execution, I respectfully dissent.

Justice LONG joins in this opinion.

*For reversal*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, WALLACE and RIVERA–SOTO—5.

*For affirmance*—Justices LONG and ALBIN—2.